**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Richard Scott McLERNON, Kido Yaqui, Sherri Louise Farrell, Miguel Angel Carranza, and Marco Antonio Valdez-Cota, Defendants-Appellants.**

Nos. 83–3519 to 83–3521, 83–3549 and 83–3550.

United States Court of Appeals, Sixth Circuit.

Argued April 3, 1984.

Decided Sept. 18, 1984.

Rehearing and Rehearing En Banc Denied Dec. 20, 1984.

Martin S. Pinales, argued, Cincinnati, Ohio, Ephraim Margolin, (LC) San Francisco, Cal., for defendant-appellant in No. 83–3519.

Christopher K. Barnes argued, U.S. Atty., Anthony W. Nyktas, Asst. U.S. Atty., Cincinnati, Ohio, for plaintiff-appellee.

William L. Summers, Summers, Potts, Kampinski, Tittle & White, Cleveland, Ohio, for defendant-appellant in No. 83–3520.

Elmer Giuliani, Cleveland, Ohio, for defendant-appellant in No. 83–3521.

David Kenner, Encino, Cal., for defendant-appellant in No. 83–3549.

Ephraim Margolin, San Francisco, Cal., for defendant-appellant in No. 83–3550.

Before JONES and WELLFORD, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Appellants Marco Antonio Valdez-Cota (Valdez), Miguel Angel Carranza-Baez (Carranza), Kido Yaqui (Yaqui), Richard Scott McLernon (McLernon) and Sherri Louise Farrell (Farrell) appeal their jury convictions in these consolidated cocaine conspiracy cases. Upon careful consideration of the myriad issues presented by their appeal, we conclude that the judgment of the district court should be affirmed in part, reversed in part and remanded in part, with instructions consistent with this opinion.

In 1974, agent Charles Hamlin of the Drug Enforcement Administration traveled to Phoenix, Arizona where he befriended Yaqui. The two became very close friends and eventually engaged in an Indian "blood brother ritual." In 1977, Hamlin left Arizona for Cincinnati. Hamlin then phoned Yaqui to say that he had some drug contacts and asked Yaqui "to keep his eyes open for possible drug connections." Yaqui, however, did not pursue any such connections. In early 1982, Hamlin again called Yaqui to explain that he was in financial trouble with a Chicago syndicate group and begged him to bring about a drug transaction. Hamlin called upon his Indian "blood brother" to do anything he could to help.

Although Yaqui had no prior experience with cocaine, he tried to help Hamlin. Hamlin instructed Yaqui in cocaine transactions and continually pressured him to attain one. In March, 1982, Yaqui informed Hamlin that he had, as Hamlin desired, secured individual cocaine contacts, including Tony Langley. Hamlin spoke to these contacts and on one occasion traveled to Phoenix to try to formalize a deal. But these deals fell through. Hamlin then began to pressure Yaqui by telling him more about his syndicate debts. Hamlin described to Yaqui the people who were threatening him:

I mean, these power people, these ain't nickel-dime, they run Atlantic City and all—I mean, they're all over the country. They're heavy. (RTT Tape No. 3, 14:8–10).

In April, 1982, Hamlin told Yaqui over the phone that he would be killed if Yaqui could not arrange a cocaine deal. Yaqui testified that he observed Hamlin carrying a gun and wearing a bullet-proof vest. He began fearing Hamlin and, thus, exaggerated his cocaine connections in order to ease the pressure.

In late 1982, Yaqui made a major cocaine contact while negotiating a business deal for distributorships. Yaqui met Valdez and the two sent $2,000 to Hamlin so he could come to Phoenix and negotiate a deal. On January 13, 1983, Yaqui and Hamlin met with Valdez and proceeded to discuss a cocaine deal. Hamlin told Valdez, through Yaqui as interpreter, that he had mob connections in the East. Hamlin insisted that any drug delivery would have to take place in Cincinnati. Valdez preferred Los Angeles and left the meeting. Hamlin returned to Cincinnati, angered at Yaqui for what appeared to be another broken deal.

Later in January, Valdez visited Yaqui at Yaqui's shop. Yaqui told Valdez that he feared Hamlin. The two agreed to go to Cincinnati to talk with Hamlin and his associates. Valdez called Hamlin and told him that they intended to make a sale of ten kilos on a trial basis and if everything went well they could sell 300 kilos. On January 25, 1983, Hamlin next met Valdez and Yaqui at the Cincinnati Airport and then introduced undercover DEA agents Stuart and Palma as drug dealers. Hamlin informed Yaqui that these men were dangerous and that one of them was a "hit man." Yaqui told Stuart that he only played an intermediary role and that Valdez controlled the cocaine. Yaqui stated that he had not seen the 300 kilos of cocaine, but knew that they were available. Agent Stuart replied that he wanted large quantities and many transactions. The parties, however, tentatively

agreed to a ten kilo sale of cocaine. Valdez told the agents that the cocaine was of superior quality. On the following day, January 26, 1983, the men made a tentative delivery plan.

Yaqui and Valdez returned to Phoenix. On January 28, Agent Stuart phoned Yaqui. In order to remove himself from any further involvement in the cocaine transaction, Yaqui told Stuart that he faced an Arizona murder investigation and was advised by his attorney to "lie low" for a while. On January 29, Hamlin called Yaqui. Yaqui stated that the cocaine deal was still on but that he would not be involved. On January 31, Yaqui told Stuart that he would arrange to have Stuart talk directly with Valdez. Yaqui resisted Stuart's constant pressure to stay in the deal.

Stuart then contacted Valdez. Valdez expressed displeasure with all of the traveling required, but agreed to meet with agents Palma and Stuart. Valdez informed the agents that Yaqui was no longer involved. On February 9, 1983, the agents called Valdez at Carranza's Los Angeles apartment. Valdez told Palma that the ten kilo deal could go through as soon as he could make some arrangements. Palma, Stuart, and Valdez agreed to make the deal in Cincinnati.

On February 12, 1983, Stuart and Palma met Valdez at the Cincinnati airport. Valdez told the agents that the cocaine would be delivered in a secret compartment of a car driven from the west coast by a man named Scott and a woman. Valdez also stated that he had a large cocaine operation. Palma testified at trial, over repeated

objections, that Valdez had told him of his lengthy past involvement with cocaine.

On February 16, Valdez phoned the agents that the cocaine had arrived. Valdez suggested that they rent a garage in which to make the deal. They rented two garages in Fairfield, Ohio. After the couriers arrived, Stuart told Valdez that he wanted to see the cocaine before he gave him the money. Valdez agreed. He went to his hotel room to get "Scott," the courier, who was later identified as Scott McLernon. The men all traveled to the rented garage. McLernon took the packages out of a secret backseat compartment. Stuart tested the cocaine and then placed Valdez and McLernon under arrest. DEA agents subsequently arrested Carranza, who had remained in his hotel room. After his arrest, McLernon was asked by DEA agent Powell about the girl with whom he had driven across the country. He agreed to take the agents back to his hotel where Sherri Farrell waited. Once in the hotel room, the agents seized a note pad and a calendar, both of which were admitted into evidence. Farrell voluntarily accompanied the agents to their offices and was questioned extensively. After Agent Stuart finished questioning Farrell, she was placed under arrest. On the next day, Yaqui was arrested in Phoenix by federal agents.

After indictment and jury trial, Valdez was found guilty of one count of conspiracy under 21 U.S.C. § 846,[1] twelve counts of unlawful telephone use under 21 U.S.C. § 843(b),[2] two counts of interstate travel to promote unlawful activity under 18 U.S.C. § 1952[3] and one count of possession with

---

**1.** 21 U.S.C. § 846

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

**2.** 21 U.S.C. § 843(b)

It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a

felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

**3.** 18 U.S.C. § 1952(a)

intent to distribute cocaine under 21 U.S.C. § 841(a)(2).[4] Carranza was found guilty of one count of conspiracy under 21 U.S.C. § 846, one count of unlawful interstate travel under 18 U.S.C. § 1952 and one count of possession with intent to distribute cocaine under 21 U.S.C. § 841(a)(1). Yaqui was found guilty of one count of conspiracy under 21 U.S.C. § 846. McLernon was found guilty of one count of conspiracy under 21 U.S.C. § 846, one count of unlawful interstate travel under 18 U.S.C. § 1952, and one count of possession with intent to distribute cocaine under 21 U.S.C. § 841(a)(1). Farrell was found guilty of one count of conspiracy under 21 U.S.C. § 846, one count of unlawful interstate travel under 18 U.S.C. § 1952 and one count of possession under 21 U.S.C. § 844. Judge Rubin sentenced defendants Valdez and Carranza to 20 years; defendants McLernon and Farrell to 5 years, and defendant Yaqui to 15 years.

## I

### Valdez's Pre-Arrest Statement

Appellants initially contend that the district court erred in admitting Valdez's pre-arrest statement concerning his lengthy history in cocaine traffic and his large cocaine organization. They assert that those statements (1) were not made in furtherance of a conspiracy, (2) were unreliable, (3) were double hearsay, and (4) were inadmissible as prior bad acts under Federal

Rules of Evidence 403 and 404(b). The government contends that, as statements made by a co-conspirator in the course of a conspiracy, Valdez's remarks were admissable under Federal Rule of Evidence 801(d)(2)(E).

■ In this Circuit, co-conspirators' statements are admissable if the government shows by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy, (3) that the statement was made during the course of the conspiracy, and (4) that the statement was made in furtherance of the conspiracy. *United States v. Hamilton*, 689 F.2d 1262 (6th Cir.1982), *cert denied*, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). The parties agree that the first three requirements were met.

■ Appellants contend, however, that Valdez's statements were not "in furtherance of" the conspiracy. They admit that Valdez told the agents that he had been in the cocaine business for 20 years, that he had a large organization, and that he had just received a large shipment. Such statements, appellants contend, were directed toward securing larger transactions after the trial deal had been accomplished. We find that those statements, however, were also designed to gain the trust and assurance of co-conspirators. They provided incentives for negotiations and peaked interest. We conclude, therefore, that the dis-

---

Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving

gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

(c) Investigations of violations under this section involving liquor or narcotics shall be conducted under the supervision of the Secretary of the Treasury.

**4.** 21 U.S.C. § 841(a)(2)

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

trict court did not err in finding that Valdez's comments were made in furtherance of the conspiracy.

■ Appellants also contend that Valdez's pre-arrest comments should have been excluded because they violated their Sixth Amendment right to confrontation. This Court has held, however, that evidence admitted as a co-conspirator's statement under Rule 801(d)(2)(E) does not violate the Sixth Amendment confrontation clause. *United States v. Marks*, 585 F.2d 164 (6th Cir.1978). The Circuits are split as to whether compliance with Rule 801(d)(2)(E) *automatically* satisfies the Sixth Amendment requirements. Because this Circuit has held that it does, however, the admission of Valdez's remarks in this case was not error.

■ Appellants Farrell and McLernon further contend that Valdez's statements concerning them constituted double hearsay. Rule 801(d)(2)(E), however, specifically exempts co-conspirator's statements from the hearsay rule. The requirement that the declarant have personal knowledge of his statements in such a case is waived. *See, e.g., U.S. v. Ammar*, 714 F.2d 238 (3d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). We find, therefore, that the hearsay rules do not preclude the admission into evidence of Valdez's pre-arrest statements.

■ Neither does the prohibition against the admission into evidence of prior bad acts preclude admission of Valdez's remarks in this case. In *United States v. Pope*, 574 F.2d 320, 328 (6th Cir.), *cert. denied,* 436 U.S. 929, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978), this Court held that the "scope of the conspiracy itself ... does not necessarily limit the application of the co-conspirator exception." The broad scope of evidence relevant to the plan, design, and nature of the conspiracy in the case before us, therefore, rendered Valdez's prior involvement admissable. The district court, we conclude, was within its discretion in determining that the probative value of that evidence outweighed the prejudice.

*See* Fed.R.Evid. 403. The district court did not err in allowing such evidence.

## II

## Sufficiency of Evidence to Support Valdez's Conviction and Absence of Entrapment

Valdez contests the sufficiency of the evidence to support his convictions for unlawful use of the telephone in violation of 21 U.S.C. § 843(b). Valdez also argues that his conviction for such use was the result of entrapment.

■ 21 U.S.C. § 843(b) renders unlawful the knowing or intentional use of "any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony...." Appellants do not deny that Valdez knowingly and intentionally used the telephone; they contend instead that he did not "facilitate" a felony. To prove "facilitation," the government must show that the "telephone call comes within the common meaning of facilitate—'to make easier' or less difficult, or to assist or aid. It is sufficient if a defendant's use of a telephone to facilitate the possession or distribution of controlled substances facilitates either his own or another person's possession or distribution." *United States v. Phillips*, 664 F.2d 971, 1032 (5th Cir.1981) (citation omitted), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Appellants contend that in several of the calls, each of which is a separate count, Valdez either said nothing about cocaine or stated that "all [the co-conspirators] can do is wait." While that statement alone is insufficient to support a conviction, it must be considered in context. In calls on February 1, 9, 11, 14, 15 and 16 Valdez either informed the agents of the progress of the deal or of the next step in the transaction. We conclude that those calls taken together, and viewed in the light most favorable to the government, *see United States v. Strong*, 702 F.2d 97, 99 (6th Cir.1983), support the jury's verdict.

Valdez alternatively contends that his convictions for unlawful use of the telephone were secured through entrapment. A violation of § 843(b) may be found, however, even when the defendant does not initiate the calls. *See United States v. Cordero*, 668 F.2d 32, 43 (1st Cir.1981). Valdez relies upon *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), for the proposition that federal agents cannot manufacture federal crimes merely by placing telephone calls to suspect individuals. As the government correctly states, however, *Archer* involved the Travel Act, not the unlawful use of the phone. We find sufficient evidence to support Valdez's § 843(b) conviction and that such evidence was not obtained through entrapment.

## III

### Travel Act Convictions

Appellants Valdez, Carranza, McLernon, and Farrell contend that their jury convictions for engaging in a business enterprise in violation of the Travel Act are not supported by sufficient evidence.

18 U.S.C. § 1952(a), (b) prohibits travel in interstate commerce to further "any business enterprise involving ... [a] narcotic." To establish a "business enterprise," the government must show "a continuous course of conduct," not just "sporadic or casual involvement" in the unlawful activity. *United States v. Davis*, 666 F.2d 195, 202 n. 10 (5th Cir.1982). Appellants contend that their involvement with cocaine was not a "continuous course of conduct."

They gain some support for that proposition from the Second Circuit's *Archer* opinion and from the Fourth Circuit's holding in *United States v. Corbin*, 662 F.2d 1066 (4th Cir.1981). In *Archer*, the Court found that federal law enforcement agents engaged in "sordid" overreaching when they "manufactured" interstate telephone calls to transform a local bribery operation into a Travel Act offense. "[W]hen the federal element in a prosecution under the Travel Act is furnished solely by undercover agents ...," *id.* at 685–86, the Court held that the government must demonstrate a high measure of nonmanufactured, unlawful interstate activity. *See id.* at 686. In *Corbin*, the Court recalled that the congressional purpose in enacting the Travel Act was to curtail organized crime activity, rather than individual or isolated involvement in drug trafficking. 662 F.2d at 1072.

Although we share *Corbin's* understanding of the Travel Act's specific purposes and *Archer's* condemnation of "sordid" governmental overreaching, we conclude that in this particular case the non-manufactured evidence of a "continuous course" of unlawful conduct was substantial. The jury heard evidence which established that appellant Valdez had control of three-hundred kilos of cocaine, had been in that business for twenty years, had an organization which imported four-hundred to six-hundred kilos of cocaine each month, and had a source in South America. Evidence was also presented that couriers McLernon and Farrell had engaged in such deliveries on previous occasions. The course of illicit conduct, thus, encompassed the entire country and spanned several years. Viewed in the light most favorable to the government, *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), the evidence of that course of conduct was sufficient to support these Travel Act convictions.

## IV

### Multiple Conspiracy Instruction

Appellants contend that the district court erred in failing to instruct the jury on the possible existence of multiple conspiracies. This failure was particularly prejudicial to Yaqui, they contend, because he clearly terminated his role in the cocaine transaction before its completion.

Yaqui's withdrawal from the transaction before its completion, however, does not necessarily signal separate or multiple conspiracies. In *United States v. Warner*, 690 F.2d 545, 549 (6th Cir.1982), this Court stated that the "essence of the crime of conspiracy is agreement." We stated:

... the government is not required to prove an actual agreement among the various conspirators in order to establish a single conspiracy.... Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often "chain" conspiracies. Because the successes of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants.

690 F.2d at 549 (citations omitted).

The *Warner* Court concluded, therefore, that a single conspiracy does not become "multiple conspiracies" merely because "each member did not know of or become involved in all of the activities in furtherance of the conspiracy." 690 F.2d at 549. *See also United States v. Gravier*, 706 F.2d 174, 178 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 494, 78 L.Ed.2d 688 (1983); *United States v. Shermetaro*, 625 F.2d 104, 108 (6th Cir.1980). The individual members of the conspiracy before us are charged with participation in a single enterprise regardless of their actual knowledge of each member or action involved in that enterprise. We conclude that the district judge was under no obligation to instruct the jury on the possibility of multiple conspiracies.

## V

### Indirect Entrapment

 Appellants Valdez and McLernon contend that the district court erred in refusing to instruct the jury on the doctrine of "indirect entrapment." Valdez argues that he engaged in this cocaine transaction because Yaqui communicated to him agent Hamlin's coercive statements. McLernon contends that he participated in the conspiracy because he heard from Carranza, who heard from Valdez, of threats made by government agents.

In *United States v. Valencia*, 645 F.2d 1158 (2d Cir.1980), *reh'g en banc denied,* 669 F.2d 37 (2d Cir.1981), *aff'd after remand,* 677 F.2d 191 (2d Cir.1982), the Second Circuit held that

[i]f a person is brought into a criminal scheme after being informed *indirectly* of conduct or statements by a government agent which could amount to inducement, then that person should be able to avail himself of the defense of entrapment just as may the person who receives the inducement directly.

645 F.2d at 1168 (emphasis added). In that case, Valencia witnessed government agents "push" and "coerce" his wife into selling cocaine. The Court found that, like in *United States v. Swiderski*, 539 F.2d 854 (2d Cir.1976), "the close marital relationship" between defendants transformed the governmental inducement of one defendant into the absolute coercion of the other. In such a situation, a jury's finding that Valencia's wife had a "propensity to commit the offense ... does not mean ... that the jury would necessarily find that [Valencia] also had such a propensity." 645 F.2d at 1169–70. Indeed governmental pressure upon one member in a special relationship such as marriage may overcome the will of another member to a greater degree by virtue of that relationship. The Second Circuit insightfully recognized the potential for the exploitation of such special relationships by governmental agents in the course of their covert enforcement operations. *Id.* at 1168–69. The Court was particularly wary of operations in which governmental agents seek to avoid the entrapment defense by coercing one member of a special relationship in order to incriminate the other targeted member. 645 F.2d at 1169.

To obviate that risk, several circuits have expanded the entrapment defense. In *United States v. Lee*, 694 F.2d 649 (11th Cir.), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983), the Eleventh Circuit quoted *Valencia* with approval, but distinguished its case based upon the fact that the inducement "originated" with a private party and not government officials. 694 F.2d at 654. In *United States v. Mers,*

701 F.2d 1321 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983), that Circuit clarified its view that a defendant may invoke the entrapment defense if "the initiator of his criminal activity is acting as an agent of the government." 701 F.2d at 1340 (citing *United States v. Noll,* 600 F.2d 1123, 1129 (5th Cir.1979); *United States v. Garcia,* 546 F.2d 613, 615 (5th Cir.)), *cert. denied,* 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977).

Entrapment, thus, may occur as the result of conduct by third-party agents or as the result of governmental action through private citizens. *See, e.g., United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *United States v. Silvestri,* 719 F.2d 577 (2d Cir.1983); *United States v. Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983); *United States v. Thompson,* 366 F.2d 167 (6th Cir.1966). In *Thompson,* this Court held that the following is a correct statement of the law: where a "person has no previous intent or no previous purpose to violate the law, but is induced or persuaded by law enforcement agents to commit a crime or *agents of the government,* he is entitled to the defense of unlawful entrapment." 366 F.2d at 175–76 (emphasis added) (referring to jury instructions); *see also United States v. Ambrose,* 483 F.2d 742 (6th Cir.1973).

While we have not adopted the indirect entrapment doctrine, this Court has upheld the entrapment defense where the inducement is initiated by government officials or by private citizens acting as their agents upon their instructions or directions. *See Thompson,* 366 F.2d at 176. The question that we must resolve, therefore, is whether government officials in this case entered into an agency relationship with Yaqui in order to induce defendants McLernon and Valdez into committing these offenses. We are unable to find any evidence that the federal agents used Yaqui as a private agent in order to incriminate the other defendants. Nor is there any evidence of a

special relationship between Yaqui and the other defendants which would make those defendants more vulnerable to coercive pressure upon Yaqui. Absent any such special relationship or third-party agency, the district court, under the law in this Circuit, was not compelled to issue an "indirect entrapment" instruction. We conclude that in this situation, therefore, the district court did not err in failing to issue that instruction.

## VI
### Entrapment

■■■■ Appellants Yaqui and Valdez further contend that the district court's "direct" entrapment instruction was unduly one-sided and prejudicial. In resolving this issue we must consider the jury charge "in its entirety and not on a sentence by sentence basis." *United States v. Smith,* 584 F.2d 759, 763 (6th Cir.1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979) (citing, *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). The district court instructed the jury that:

[T]he defendants [Valdez] and Yaqui assert that they were victims of entrapment as to the offenses charged in the indictment. Entrapment is a complete defense. Entrapment occurs when the government's deception actually implants the criminal design in the mind of a defendant. Where a person is ready and willing to break the law, the mere fact that government agents provide what appears to be a favorable opportunity, or participate, themselves, in the offense itself, is not entrapment. Unlawful entrapment can only result from the conduct of a governmental agent, or a person acting upon the instructions or direction of any law enforcement officer of the United States.

Criminal activity is such that stealth, strategem and undercover agents are necessary weapons in the arsenal of police officers.

For example, when the government suspects that a person is engaged in the sale of counterfeit currency, it is not

entrapment for a government agent to pretend to be someone else and to offer, either directly or through an informer or decoy to purchase counterfeit currency from such suspected party.

Note: The function of law enforcement is the prevention of crime and the apprehension of criminals. This function does not include the manufacturing of crime.

The burden is upon the government to establish beyond a reasonable doubt the defendants were not entrapped. To determine whether there has been entrapment a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal.

We find this instruction to be an accurate conglomeration of Supreme Court and Sixth Circuit pronouncements on the entrapment defense. In *Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932) the Supreme Court reaffirmed that "officers or employees of the Government [may] afford opportunities or facilities for the commission of the offense.... Artifice and stratagem may be employed to catch those engaged in criminal enterprises." The Court held, however, that an otherwise valid prosecution becomes entrapment where governmental agents "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." 287 U.S. at 442, 53 S.Ct. at 212–213. In *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), the Supreme Court further defined the legal parameters of the entrapment defense:

The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer....

To determine whether entrapment has been established, a line must be drawn between the trap for the unwary inno-

cent and the trap for the unwary criminal.

356 U.S. at 372, 78 S.Ct. at 820. Similarly, in *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973), the Supreme Court stated that, "[i]t is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." The district court's instruction in the present case thus reiterated the Supreme Court's language in *Russell*, *Sherman* and *Sorrells*.

This Circuit, moreover, has expressly adopted that Supreme Court language in approving jury instructions nearly identical to those issued in the case at bar. *See, e.g., United States v. Norton*, 700 F.2d 1072, 1075 (6th Cir.), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983); *United States v. Leja*, 563 F.2d 244 (6th Cir.1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 789 (1978); *United States v. Eddings*, 478 F.2d 67 (6th Cir. 1973). In *Eddings*, we approved the trial court's use of a hypothetical to explain to a jury the dimensions of the entrapment defense. 478 F.2d at 72 n. 1. *See also Smith*, 584 F.2d at 763. The precise language employed by the district court in the case before us, including its hypothetical, therefore, has been sanctioned by this Circuit and by the Supreme Court. We find no error in the manner in which the district court communicated to the jury the issues and standards that they were to consider in determining whether the government disproved beyond a reasonable doubt the entrapment of Valdez and Yaqui.

■■■ Although we find the actual language of the jury instructions in this case to be proper, we still must assess the propriety of placing the issue of entrapment before the jury. In cases where the evidence bearing on the issue of entrapment is in dispute, the defense of entrapment must be submitted to the jury. *See United States v. Carroll*, 518 F.2d 188 (6th Cir.1975). Because the issue of Valdez's entrapment was "in dispute" and the jury, under a proper instruction, could well have

found the absence of his entrapment, we conclude that the issue of his entrapment was properly submitted to the jury.

 We must further determine whether the issue of Yaqui's entrapment was properly placed before the jury. If the facts pertaining to that issue are not in real dispute, the question of entrapment may be taken from the jury. *See Sherman,* 356 U.S. at 373, 78 S.Ct. at 821. In *Sherman,* the Supreme Court concluded that the evidence of entrapment was improperly placed before the jury because that evidence established entrapment "as a matter of law." *Id.* at 373, 78 S.Ct. at 821. In that case, the government sought to overcome the entrapment defense by claiming that petitioner "evinced a 'ready complaisance' to accede to" the agents' narcotics requests. *Id.* at 375, 78 S.Ct. at 822. In order to show a predisposition to commit the offenses, the government entered evidence of petitioner's past narcotics convictions. Despite such evidence of prior involvement with narcotics, the Supreme Court found unsupported the government's claim that the defendant was predisposed to violate the narcotics laws. The Court discovered "no evidence that petitioner himself was in the trade," and declared insufficient to establish a predisposition evidence that the defendant had previously been convicted of the sale and possession of narcotics. *Id.* The Court, therefore, reversed the jury's finding that the defendant had not been entrapped. In order for an entrapment case to reach the jury in accordance with *Sherman,* the government must present some evidence from which a jury could conclude that the defendant was predisposed to break the law before he received the opportunity afforded by government agents. *Id.* at 373, 78 S.Ct. at 821.

This Court has adopted the Supreme Court's standard for taking the issue of entrapment from a jury. In *United States v. Hodge,* 539 F.2d 898 (6th Cir.), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1976), we stated clearly that:

> Entrapment is established as a matter of law if the undisputed evidence demon-strates that government agents engaged in conduct which "overbears an otherwise innocent person's will and thereby induces him to commit a criminal act that he was not disposed to commit."

539 F.2d at 906 (quoting *United States v. Ambrose,* 483 F.2d 742, 746 (6th Cir.1973)). In *United States v. Jones,* 575 F.2d 81 (6th Cir.1978), this Court reiterated with approval Judge Celebrezze's language in *Hodge* and concluded that, although entrapment usually presents a jury question, such a defense may be established as a matter of law where the government presents no evidence to meet its burden of proving disposition or readiness beyond a reasonable doubt. 575 F.2d at 84. *See also Sherman,* 356 U.S. at 373, 78 S.Ct. at 821.

 In accordance with Sixth Circuit and Supreme Court precedent, therefore, we must determine whether the "undisputed evidence" in this case was sufficient to establish beyond a reasonable doubt that defendant Yaqui was induced to commit criminal acts he was not otherwise disposed to commit. *See Hodge,* 539 F.2d at 906; *Jones,* 575 F.2d at 84.

 In determining whether the evidence was, as a matter of law, insufficient to establish predisposition, we must view that evidence in the light most favorable to the prosecution and resolve all reasonable inferences therefrom in its favor. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Viewing the evidence in this light, we must uphold the jury's verdict unless no reasonable juror could conclude beyond a reasonable doubt that Yaqui was predisposed to commit the offense charged. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *United States v. Jannotti,* 673 F.2d 578 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

 Those Circuits which have addressed the kind and degree of evidence sufficient to support a predisposition finding have delineated several factors relevant to such a finding. *United States v. Kaminski,* 703 F.2d 1004 (7th Cir.1983); *Jan-*

*notti*, 673 F.2d at 597–98; *United States v. Reynoso-Ulloa*, 548 F.2d 1329 (9th Cir. 1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). Predisposition, these courts have stated, is "by definition, 'the defendant's state of mind *before his initial exposure to government agents*'" *Kaminski*, 703 F.2d at 1008 (emphasis in original). "One is either predisposed to commit a crime *before coming into contact with* the government or one is not." *Kaminski*, 703 F.2d at 1008. The factors relevant to determining a defendant's prior disposition include:

> the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*Kaminski*, 703 F.2d at 1008 (quoting *Reynoso-Ulloa*, 548 at 1336); *See also United States v. Townsend*, 555 F.2d 152, 155 n. 3 (7th Cir.), *cert. denied*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977).

In considering those factors, we find initially that the government presented no evidence of the character or reputation of Yaqui, including any prior criminal record, from which a reasonable juror could have found that he was predisposed to violate 21 U.S.C. § 846. In *Sherman*, the Supreme Court held that evidence of a prior criminal record alone is insufficient as a matter of law to establish predisposition. 356 U.S. at 375, 78 S.Ct. at 822. In the case before us, the government did not even present evidence of Yaqui's prior criminal record. Indeed no such evidence exists. The undisputed testimony reveals instead that Yaqui is a forty-four year old American citizen of Mexican-Indian origin who has lived in Phoenix, Arizona since birth. He has had no formal education and can neither read nor write English. For three years Yaqui served in the Marine Corps. After his honorable discharge, he pursued employment as a "hard working" deliveryman for Bulk Technical Corporation and an industrial artist for Douglas Aircraft Company. Yaqui then volunteered his time to the "YMCA working with kids that have problems," the Boys Club and the Salvation Army. He "donat[ed]" himself to the Salvation Army because he felt that he "had a gift for something, of helping kids." (App. 524a). This uncontroverted evidence of Yaqui's "character or reputation" reveals absolutely no propensity for criminal involvement prior to governmental inducement. *See Kaminski*, 703 F.2d at 1008. The record is void of evidence from which a reasonable juror could have concluded that Yaqui's character or reputation predisposed him to engage in an illicit narcotics conspiracy.

Moreover, the record conclusively demonstrates with no dubiety that government agent Hamlin initiated the unlawful activity. In a recorded conversation (RT 1169:4–10), Hamlin first "gave [Yaqui] instructions to keep [his] eyes open" for possible drug connections. (App. 531a). At that time, Yaqui knew nothing of the quality or price of cocaine. (App. 531a). He had never been involved with any "kind of transactions involving cocaine." (App. 531a). Hamlin's insistence that Yaqui become involved with cocaine and Yaqui's complete lack of involvement in or familiarity with cocaine were recorded on tape and played before the jury. "The suggestion of the criminal activity," therefore, "was initially made by the Government." *Kaminski*, 703 F.2d at 1008.

Furthermore, the government initially suggested to Yaqui that his involvement with cocaine would be profitable. In 1982, after Hamlin on many occasions had unsuccessfully urged Yaqui to strike a cocaine deal, the agent informed Yaqui that he could arrange marketing and distributorships for his shampoo and hair-care products. Hamlin promised distribution networks and television advertisements for Yaqui's products in the Cincinnati area. Several taped conversations indicate that the agent induced Yaqui to generate a co-

caine transaction as a quid pro quo for business profits that only the agent could provide. (RT 1510:7–12). In determining whether the inducement of profit bears upon Yaqui's predisposition, we are mindful of the fact that the government, unlike the typical criminal, "may offer as much as it wished to any potential defendant." *Kaminski*, 703 F.2d at 1008.

> If the amount offered is "a substantial inducement to a first offense," . . . this may negate the inference normally drawn from a defendant's ready acquiescence to a suggestion that he commit a crime as even a person with no criminal predisposition may abandon his moral standards when the reward is substantial.

*Kaminski*, 703 F.2d at 1008 (citation omitted).

The distributorship and marketing opportunities offered by Hamlin were substantial additional inducements to Yaqui's first offense. By virtue of his status as a government agent Hamlin was able to offer Yaqui just what he needed for his business. The government's profit inducement, thus, is a strong factor which negates any inference that Yaqui was predisposed to conspire to violate the narcotics laws.

The most important factor in determining the lack of predisposition as a matter of law, however, is " 'whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducements.' " *Kaminski*, 703 F.2d at 1008 (quoting *Reynoso-Ulloa*, 548 F.2d at 1336). In the case before us, the profit motive was an additional inducement created by the government after Yaqui exercised reluctance to generate successful cocaine deals. Yaqui's reluctance is evidenced by the fact that Hamlin continually increased the pressure until Yaqui finally acquiesed in his demands. The nature of the government inducement in this case is unique. In 1974, agent Hamlin travelled to Arizona, where he befriended Yaqui. Hamlin "was seeking for a friend, so immediately [they] developed a real good relationship in a very short time." (App. 523.6a). Yaqui and Hamlin became so close that they performed the Indian ritual of becoming "blood brothers." Yaqui testified:

> We became what we call blood brothers. We swore into the ritual face that I taught him, and he knew quite a lot about it, that my life would be his life.

(App. 523.6a). Agent Hamlin and Yaqui frequently called each other "blood brother." Hamlin in fact introduced Yaqui to his family by stating: "Here's my blood brother; he's going to be one of the family; treat him just like the family." Hamlin and Yaqui in "private" recorded conversations often stated that they loved each other. In 1977, Hamlin told Yaqui that he had to return to Cincinnati to tend to his dying mother-in-law. The two hugged each other and promised to stay in close contact.

After Hamlin returned to Cincinnati, he began telling Yaqui of his involvement with "the syndicate, the mob . . . and he was requesting things from [Yaqui], and I—our relationship kind of changed because he became then more, instead of a brother, he became more like a father, like a dictator to me, so it was a commitment, I just didn't know which way to turn." (App. 527a). Thus, Yaqui responded to Hamlin's initial suggestions that he strike a drug deal with confusion, reluctance, awkwardness and dilatory tactics. But Hamlin mounted the pressure. In 1982, Hamlin told Yaqui that he was in trouble with a Chicago syndicate group and that his life was in jeopardy. Hamlin phoned Yaqui several times and told him that unless his "blood brother" would help him land a cocaine deal he would be killed. Hamlin implored: "Blood brother . . . if there is any possible way that you can help me, will you do it . . . ?" Yaqui responded that he would sooner sell his business than let anything happen to his blood brother. (App. 529a). When he became convinced that his blood brother would be killed by the mob if he did not negotiate a cocaine deal, Yaqui finally acquiesced in Hamlin's demands, stating, "I'll do anything in the world for you, Carlos, no matter what it is." Hamlin repeated in

several taped conversations that Yaqui's failure to generate a cocaine transaction would result in death to his "blood brother." After repeating that inducement, Hamlin added the inducement of business profit. The repetitious and escalating governmental inducement in this case, therefore, undeniably overcame Yaqui's nondisposition to enter the cocaine conspiracy. The jury found that Yaqui did not travel in interstate commerce to facilitate the drug transaction, did not use any communication facility to facilitate that transaction and did not use the telephone to facilitate the possession or distribution of any narcotics on any occasion. The jury only convicted Yaqui of entering into the conspiracy requested by Hamlin. Once he believed Hamlin to be safe, Yaqui, the jury found, and the government concedes, withdrew from any further involvement in the conspiracy. (Gov'nt. brief, p. 49).

On the record before us, we find no evidence that Yaqui's character or reputation inclined him toward criminal activity, no evidence that Yaqui initiated the criminal activity, no evidence that Yaqui readily accepted the opportunity presented by government agents, and no evidence that Yaqui would have committed this crime absent the overwhelming strength of agent Hamlin's inducement. We find instead that agent Hamlin induced an unwary and innocent man into committing crimes he was not predisposed to commit by becoming his "blood brother" and preying upon the love and loyalty of that special relationship. After considering each of the factors which may demonstrate predisposition, *see Kaminski,* 703 F.2d at 1008; *Reynoso-Ulloa,* 548 F.2d at 1336; *Townsend,* 555 F.2d at 155, we conclude that the government presented no evidence from which a reasonable juror could have concluded that Yaqui was predisposed to conspire to violate the narcotics laws. *See Sherman,* 356 U.S. at 373, 78 S.Ct. at 823; *Kaminski,* 703 F.2d at 1007; *United States v. Spain,* 536 F.2d 170 (7th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976). Under the peculiar circumstances of this case, there-

fore, we find that Yaqui was entrapped as a matter of law.

Yaqui contends alternatively that the district court erred in instructing the jury on his affirmative defense of withdrawal from the conspiracy. The court instructed the jury in accordance with this Circuit's decision in *United States v. Battista,* 646 F.2d 237, 246 (6th Cir.), *cert. denied,* 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981) that the burden is on the defendant to establish such withdrawal. Yaqui does not quarrel with this Circuit's well-established allocation of the burden of proof on the issue of withdrawal. He contends rather that we should adopt the reasoning of *United States v. Read,* 658 F.2d 1225 (7th Cir.1981) and shift to the government the burden of proving Yaqui's continuous involvement in the conspiracy. We need not decide whether to adopt the *Read* approach, however, because our finding that Yaqui was entrapped as a matter of law into violating 21 U.S.C. § 846 and the jury's finding of not guilty on every other charge renders cummulative any error in the withdrawal instruction.

## VII

### Expert Testimony

Our holding with respect to Yaqui's entrapment defense similarly obviates the need to consider whether the district court erred in excluding in his particular case the expert testimony of Dr. James Titchener. Appellants Valdez and Carranza, however, also contend that the district court erred in excluding Dr. Titchener's testimony. We must consider that assignment error as it pertains to their convictions.

The district judge excluded Dr. Titchener's expert psychiatric testimony pursuant to Federal Rule of Criminal Procedure 12.-2(b). At the time of trial that Rule provided:

(b) If a defendant intends to introduce expert testimony relating to a mental ... condition bearing upon the issue of whether he had the mental state required for the offense charged, he

shall ... notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk.

Failure to give notice when required under this subdivision may result in the exclusion of "the testimony of any expert witness offered by the defendant on the issue of his mental state." Fed.R.Crim.P. 12.2(d).

 The Advisory Committee Notes state that the objective of this rule is to provide the government "time to prepare to meet the issue which will usually require reliance upon expert testimony." The district judge found that admission into evidence of appellants' expert testimony with virtually no advance notice to the government would violate "at least the spirit" and probably the terms of Rule 12.2(b). The district judge has wide discretion to excuse appellants' failure to grant timely notice of their expert's testimony, but also has broad discretion to exclude such testimony. *United States v. Brown,* 557 F.2d 541 (6th Cir.1977).

 In excluding that testimony in this case, the district judge relied upon the dissent in *United States v. Hill,* 655 F.2d 512 (3d Cir.1981). The dissenting opinion in that case reasoned that although Rule 12.-2(b) does not explicitly apply to the entrapment defense, the spirit of that rule should cover the "mental condition" of the absence of predisposition which is central to the defense. Persuaded by that reasoning, and acting within a void of Sixth Circuit law on this question, the district judge excluded Dr. Titchener's expert testimony. Rule 12.2 has since been amended to include within its scope expert testimony on the entrapment defense. At the time of trial the spirit, and now the letter, of Rule 12.2 militate in favor of the district court's decision to exclude expert testimony where notice of such testimony was first given on the sixth day of trial. Appellants knew before trial that they would present an entrapment defense and, thus, had ample opportunity to notify the government. Although we realize that expert testimony concerning a defendant's predisposition

may be invaluable in an entrapment case, *see United States v. Garrett,* 716 F.2d 257 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984); *United States v. Rohrer,* 708 F.2d 429 (9th Cir.1983), we conclude that this district court acted within its wide discretion in excluding such evidence in this case.

## VIII

### District Court Restriction of Appellant's Cross-Examination

Appellants contend that the district court abused its discretion in restricting the scope of their cross-examinations of government witnesses. After the government completed direct examination of its first witness, the district judge warned the several defense counsels against "repetitious cross-examination." The judge stated:

> Gentlemen, I just wanted to remind you, you may select any attorney to do the interrogation, cross-examination. In addition, each counsel may further interrogate as to matters concerning his client. I'll not permit repetitious cross-examination simply because you think you can do it better.

(App. 192a).

The district judge proceeded to restrict the scope of defense counsels' cross-examination as "repetitious" throughout trial. Appellants cite at least eighteen instances in which the district court interrupted their cross-examinations. The court, for example, refused to allow Valdez's counsel to question agent Palma about "any investigation" performed by the United States Customs or the State Department in connection with Valdez's "organization." Stating that the "United States government is not on trial," (App. 201a), the district judge denied the line of questioning as irrelevant and cumulative. The court also found to be cumulative counsels' repeated questions to Palma about whether the "situation" in the rental garage was "right for a rip-off." (App. 218a). The judge stated:

I'm going to stop you if you ask a question twice. You may ask it once. If you don't get an answer, you're entitled to pursue it.

(App. 218a).

The trial court scrutinized defense counsels' cross-examination on subsequent occasions to insure that the trial proceeded in a focused fashion. Because Valdez's counsel had "asked [Palma about Valdez's propensity for exaggeration] twice and he [had] answered it twice," for example, the district judge required counsel to ask a "new question." (App. 226a). In a similar instance, the district judge refused to allow counsel to drive home again and again his point that government agents would have suspected the criminal involvement of any individual who happened to be near Valdez during the transaction. The court instructed counsel:

The witness has answered and you have asked the question repeatedly. You are not entitled to the answer you want. You're entitled to an answer to your question.

(App. 230a). The district judge also severed counsel's cumulative questioning on the Mexican judicial system (App. 235a), Palma's knowledge of the release of witness Gonzales (App. 238a), Palma's "untruths" told to Valdez in an undercover capacity, Palma's knowledge of Hamlin's "untruths" about syndicate connections (App. 258a), Hamlin's calls to Yaqui (App. 427a, 428a), Hamlin's early contacts (App. 437a), Valdez's Los Angeles contacts (App. 849a), Farrell's "nice" character (App. 504a), Hamlin's memory of a conversation with Stuart involving coercive techniques for insuring that the cocaine deal be consummated in Ohio (App. 717a), and Hamlin's contacts with Tony Langley (App. 720a). In each case, the district judge found the questioning repetitious. The judge also reprimanded counsel for attempting to demonstrate to the jury the relative position of the parties during the government's interrogation of Carranza at DEA headquarters. The court accused counsel of deliberately "violating [his] rules" (App. 379a) by engaging in "repetitious cross-examination."

■ Although we cannot fully condone the nature of the district court's admonishment of defense counsel at every turn, we find substance in each of the court's rulings. The district court has wide discretion to limit cumulative, irrelevant, or harassing questioning. *United States v. Pritchett,* 699 F.2d 317, 321 (6th Cir.1983). The court may not exercise that discretion, however, when to do so would prevent defense counsel from exploring the bias, prejudice, and credibility of government witnesses. *United States v. Callahan,* 551 F.2d 733 (6th Cir.1977). Such explorations provide the principal means of vindicating an accused's Sixth Amendment right to confront adverse witnesses. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

■ Our review of this record reveals that the district court did not prevent defense counsel from adequately cross-examining government witnesses. *See, e.g., United States v. Fife,* 573 F.2d 369 (6th Cir.1976), *cert. denied,* 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977). Counsel were permitted to challenge the credibility of government witnesses and the veracity of their testimony. The district court, we find, channeled and directed, but did not prevent, the confrontation by defense counsel of government witnesses. While we do not commend this degree of trial control, we conclude nevertheless that the district court's somewhat inordinate restrictions upon defense counsel's cross-examinations of government witnesses was not an abuse of discretion.

## IX

### Exclusion of Taped Conversations

■ Appellants Valdez, McLernon and Yaqui additionally contend that the district court abused its discretion in excluding taped conversations involving agent Hamlin. They contend first that taped conversations between Hamlin and Yaqui's neighbor, Tony Langley, should have been admitted into evidence because they were rele-

vant to prove a "systematic campaign" of Hamlin's coercive law enforcement techniques. Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The district court has broad discretion pursuant to this rule and Rule 403 to deny the admission of such character evidence if its prejudice outweighs its probative value. *United States v. Perrin*, 580 F.2d 730 (5th Cir.1978), *aff'd*, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).

In *United States v. Callahan*, 551 F.2d 733 (6th Cir.1977), this Court found that the trial court abused its discretion in denying the defendant's right to challenge with evidence of a "routine practice" the present conduct of an adverse witness. The Court held that evidence of such a routine is relevant to prove particular conduct in conformity therewith. 551 F.2d at 736. Following comparable reasoning, the Court in *United States v. McClure*, 546 F.2d 670 (5th Cir.1977), found error in the trial court's exclusion of testimony concerning a government informant's previous coercive enforcement techniques. The exclusion of that testimony, which established a plan or scheme pursuant to Rule 404(b), undermined the defendant's "right to present a vigorous defense." 546 F.2d at 673.

■ Had the district court in the case before us excluded evidence of agent Hamlin's prior schemes of coercive enforcement we would be compelled by the authority of Rule 404(b), *McClure* and *Callahan* to find error. The record, however, indicates that the district judge and counsel listened to the offered tapes and engaged in argument over their admissibility. The tapes do not yield any evidence of agent Hamlin's coercive tactics. The agent speaks in ominous terms about the dangers inherent in the narcotics business, but his primary concern is in striking a deal with Langley. Hamlin never induced or threatened Langley in the manner in which he was alleged to have induced and threatened the present appellants. Absent their capacity to reveal a coercive plan or scheme, the tapes at issue contain little probative value. We conclude, therefore, that the district court did not err in excluding the recorded conversation between Hamlin and Langley.

■ Appellants also argue that the district court erred in excluding the taped conversation between Hamlin and agent Dick Stuart. In that conversation, Hamlin asked Stuart what tactics he should employ if cocaine dealers in Arizona refuse to travel to Cincinnati to complete a deal. (App. 717a). While such evidence is clearly relevant to the issue of whether agent Hamlin entrapped appellants into bringing cocaine to Ohio in violation of the Travel Act, our review of the transcript reveals that the jury considered ample evidence of the role played by the agents in inducing such interstate travel. The taped conversation between Hamlin and agent Lionel Stewart, which the jury did hear, describes the agent's desire to bring the cocaine transaction into Ohio. The Richard Stuart-Hamlin tape, thus, was merely cumulative of evidence already before the jury. The district court, therefore, acted within its wide discretion when it decided to exclude the taped conversation. *See* Fed.R.Evid. 403; *Perrin*, 580 F.2d at 736–37. We find that the district court did not err in excluding two of Hamlin's recorded conversations.

## X

### Voluntariness Instruction

Appellant Carranza contends that the district court erred in failing to issue a voluntariness instruction in regard to his incriminating post-arrest statements to DEA agents Palma and Stuart. Before trial, Carranza moved to suppress those post-arrest statements on the grounds that he made them without benefit of counsel. During hearings on that motion, the district court heard the testimony of agents

Stuart and Palma. Carranza, however, exercised his Fifth Amendment privilege not to testify at the hearings. On April 29, 1983, the district court denied the motion to suppress, finding that

> Carranza's inculpatory statements made at the DEA headquarters appear to have been completely spontaneous, made as a result of his independently observing defendants McLernon and Farrell, rather than in response to any interrogation by the DEA agents.

(App. 71a). Carranza does not now dispute the district court's finding, based upon the evidence presented at the hearing, that he waived his right to counsel.

■ Carranza contends instead that the evidence presented at trial required the district judge to issue a voluntariness instruction pursuant to 18 U.S.C. § 3501(a). That mandatory provision provides:

> If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge *shall* permit the jury to hear relevant evidence on the issue of voluntariness and *shall* instruct the jury to give such weight to the confession as the jury feels it deserves under the circumstances.

(emphasis added). This provision does not afford, and appellant does not request, a second determination of admissibility. *United States v. Barry*, 518 F.2d 342 (2d Cir.1975). After the trial judge has decided to admit the evidence, however, § 3501(a) "unequivocally require[s] a specific charge on the issue of voluntariness." *Id.* at 346. The district court's failure to provide a specific voluntariness instruction where the question of voluntariness presents a genuine issue of fact constitutes plain error. *United States v. Bondurant*, 689 F.2d 1246 (5th Cir.1982); *United States v. Groce*, 682 F.2d 1359 (11th Cir.1982); *United States v. Maher*, 645 F.2d 780 (9th Cir. 1981); *United States v. Fera*, 616 F.2d 590 (1st Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980).

■ In this Circuit, a district court must provide a specific voluntariness instruction if the issue of voluntariness has been placed before the jury. *United States v. Dye*, 508 F.2d 1226 (6th Cir.1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *United States v. Goss*, 484 F.2d 434 (6th Cir.1973). In *Dye* we held that if a defendant makes "an effort to get *before the jury* any evidence which would put the voluntariness of the statement in issue," the district judge need not provide a specific voluntariness instruction. *See* 508 F.2d at 1232 (emphasis added). This Court in *Goss* similarly held that a "challenge, *before the jury*, as to the confession's voluntariness" requires a voluntariness instruction. *See* 484 F.2d at 438.

■ The precise issue currently before us, therefore, is whether Carranza placed evidence *before the jury* to challenge the voluntariness of his confession. At trial, Carranza decided not to exercise his Fifth Amendment privilege not to testify. He testified that at DEA headquarters he first answered Agent Stuart's questions about his personal history, his method of transportation to Cincinnati, his reason for being in Cincinnati, his traveling companion, witness Alejandro Gonzales and his involvement with McLernon. The voluntariness of these statements is not at issue.

Carranza testified, however, *before the jury* that during his conversation with Stuart, agent Palma entered the small room at DEA headquarters:

A. Yes, he walk in the room. He was mad.

Q. He was mad?

A. Yes, he and he told me, "You're the head; you're the chief, and you, I'm going to, you're going to talk."

Q. Excuse me, excuse me. He told you you were the head and you were the chief?

A. Yes. He told me that. "You're the head; you're the head, you're the chief."

Q. Where were you at the time he was telling you this?

A. I was seated. I was seated in a chair with this small desk, and the right arm cuffed.

THE INTERPRETER: Handcuffed.

Q. The right arm what?

THE INTERPRETER: Handcuffed.

A. With it cuffed to it.

Q. To the chair?

A. To the chair.

Q. What else did Agent Palma say to you? Did he talk to you in Spanish?

A. Yes, he was talking in Spanish.

Q. Tell us what he said, everything.

A. Well, he, Mr. Stuart was like far away, like her, and I was seated here, and Palma came and he told me that— no, and he say, "You're going to talk." And then he shake the chair.

Q. He did what to the chair?

A. He shake my chair.

Q. Shake?

A. And I don't know, if they find me with you alone, you talk. You know what the Federalists do in Mexico.

A. What is that, torture?

THE INTERPRETER: He refer to the Federalist in Mexico, say they torture.

Q. They torture, okay, Go ahead.

A. And then he say, "If they find me alone with you alone you will talk." And then I—well—

THE INTERPRETER: And he got afraid.

(App. 669a–671a).

Agent Stuart testified that Palma then told Carranza that he would repeat to him (Stuart) in English everything the prisoner had told him in Spanish. Palma instructed Carranza:

I'm going to go slow and if anything I say is incorrect, please stop me, and I want to be sure that everything I tell him is what you just told me.

(App. 313a–314a). Stuart then stated *before the jury* that

during the time Agent Palma was saying in English what Miguel Carranza told him in Spanish at least twice he stopped and he said, "Miguel, is that correct," and I looked over at Miguel Carranza and his head was kind of hung. He seemed to be kind of despondent, but he did nod his head affirmatively.

(App. 313a–314a). Evidence was presented *before the jury* in testimony from Stuart and Carranza, therefore, which indicates that the defendant did not affirmatively stop the agents in their incriminating account of his testimony after one of them had threatened him with torture, had violently shook his chair and had attempted to strike him. We find that this evidence is more than adequate to place before the jury the issue of the voluntariness of Carranza's confession.

The issue of voluntariness moreover was central to Carranza's defense. His counsel argued *before the jury:*

[D]o you remember what Carranza said? He was seated in the DEA's office. That Mr. Palma came over, bent over, grabbed his chair and rattled it, told him about tortura, torture, told him about federales in Mexico, and went on to repeat a bunch of statements that Miguel Carranza denied that he made to agent Palma.

Now, you heard the quality of Miguel Carranza's English, but more important than the intimidation and the fear, more important than what I submit to you is the deliberate fabrication of statements in evidence, ladies and gentlemen, where is the evidence available to the government, that, I submit, if these statements were true you would have before you now.

(App. 787a). Because Carranza placed a genuine voluntariness issue before the jury, the district court was required by 18 U.S.C. § 3501(a) to issue a specific voluntariness instruction.

The government seeks to avoid the imperative of § 3501 by claiming that Carranza argued that his post-arrest statements were *never* offered, not that they were involuntarily offered. While we find that Carranza and Carranza's attorney questioned *both* the voluntariness and the veracity of the defendant's admissions, the fact that he denied making those statements could not have relaxed the requirements of § 3501. In *Barry,* the Court stated that § 3501's "imperative is not quali-

fied ... by a defendant's denial that he has ever made any inculpatory statements." 518 F.2d at 346. "A defendant," the *Barry* court stated, "may properly claim that he made no incriminating statements and that any statements which the jury might find that he made were coerced." 518 F.2d at 347; *Stevenson v. Boles,* 331 F.2d 939 (4th Cir.), *modified,* 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964). Thus even if Carranza did deny the fact that he offered the inculpatory statements, the district court was still required to issue a specific voluntariness instruction. We conclude that the district court's failure to issue such an instruction in this case constituted error.

We find, moreover, that the district court's error was not "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Goss,* 484 F.2d at 437. In considering whether the error in this case was harmless, we must appraise the impact of the error on the jury. *Kotteakas v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Barry,* 518 F.2d at 348. In *Kotteakos,* the Supreme Court stated that we should be more quick to perceive prejudice to the defendant "where the departure is from a constitutional norm or a specific command of Congress." 328 U.S. at 764–65, 66 S.Ct. at 1247–1248. Section 3501 is a specific congressional command designed to vindicate and reify a constitutional norm. 1968 U.S.Code Cong. & Ad.News 2137. While our quickness to perceive prejudice, therefore, would be justified, the meticulousness with which we scrutinize this record reveals such prejudice. Reviewing the government's evidence *exclusive* of Carranza's admissions, *see Goss,* 484 F.2d at 437, we find only disputed circumstantial testimony about the defendant's reason for being in Cincinnati and his possible use of the phone in connection with the cocaine transaction. Absent the disputed confession, the government presented little hard evidence from which we could conclude beyond a reasonable doubt that the error was harmless.

■ The general charge actually issued by the trial court, moreover, did not as the government urges, cure the defect. Stating that he did not "think [voluntariness] requires a specific instruction," the district court charged the jury in typical terms that they should weigh the evidence and the credibility of the witnesses. The Supreme Court, however, has often held that a jury charge which addresses the reliability and accuracy of the testimony does not cover the equally important but distinct consideration of voluntariness. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Relying upon these cases, the *Barry* court stated that

the Supreme Court has repeatedly emphasized that a challenge to voluntariness raises a consideration at least as significant as reliability and accuracy: the unfairness involved when "the state ... by coercion prove[s] its charge against an accused out of his own mouth."

518 F.2d at 348 (citations omitted) (brackets in original). *Barry* rejected a general charge nearly identical to the one at bar where a voluntariness instruction was required. That Court astutely concluded that were it to adopt the government's loose interpretation of § 3501, the entire statute "would become effectively superfluous, since it might be satisfied in any case by the standard boilerplate charge on credibility." *Id.* at 347. Congress, the court reasoned, "contemplated a specific reference to the confession" because where "a general charge is not even supplemented by a limiting instruction at the time the evidence is introduced, the jurors are all too apt to conclude that the judge has made a binding determination that the confession was in fact and law voluntary, or perhaps more serious, true." *Id.* at 347–48.

In light of the inherent prejudice in allowing the jury to consider Carranza's confession without a specific voluntariness instruction and the paucity of the government's additional proof against Carranza, we conclude that the district court's error in failing to abide by the § 3501 require-

ments was not harmless beyond a reasonable doubt. Because our disposition of Carranza's § 3501 claim requires that he receive a new trial, we need not reach his additional contention that the district court erred in admitting in redacted form McLernon's post-arrest statements.

## XI

### The Departure of Witness Gonzales

Additionally, appellant Carranza contends that his indictment should be dismissed altogether because the government facilitated the departure from this country of one of his witnesses in violation of his Fifth and Sixth Amendments rights.

In *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982), the Supreme Court found that "the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." Before concluding that the government exercised its duties in "good faith," we must find that (1) the testimony of the witness would not have been "both material and favorable to the defense," *id.* at 873, 102 S.Ct. at 3449; (2) the government did not facilitate the "prompt deportation" of the illegal-alien witness, *id.* at 872–73, 102 S.Ct. at 3449–3450; and (3) the witness' prompt deportation did not deprive the defendant and his attorney of "an opportunity to interview the witness to determine precisely what favorable evidence" he might offer. *Id.* at 873, 102 S.Ct. at 3449. The government does not contest the fact that it facilitated or "assisted" the witness' return to Mexico. (G.B. p. 101). In this Circuit, the facilitation of a voluntary departure is equivalent to the government's deportation. *United States v. Armijo-Martinez*, 669 F.2d 1131 (6th Cir.1982).

The questions that we must resolve, therefore, are whether evidence was introduced to suggest that witness Gonzales would have been both "material and

favorable" to Carranza and whether Carranza's attorney had a sufficient opportunity to interview the witness before his prompt departure. Carranza testified at trial that he traveled to Cincinnati with Gonzales on a commercial airline. He stated that the two of them did not, as Valdez's alleged pre-arrest statements indicated, fly to Cincinnati on a private jet for the purpose of furthering the cocaine transaction. Gonzales and Carranza rather had arranged to leave Cincinnati for New Jersey on legitimate business before they were arrested. Gonzales, thus, was a witness to Carranza's actions and purposes immediately before the drug transaction occurred. (App. 656–659a). Gonzales' testimony presumably would have been "both material and favorable" to Carranza's defense. In *Valenzuela-Bernal*, the Supreme Court warned that "[b]ecause prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess ... the defendant cannot be expected to render a detailed description of their lost testimony." 458 U.S. at 873, 102 S.Ct. at 3449.

We must, therefore, turn to the question of whether Carranza's counsel had sufficient opportunity to interview the witness before his departure. The record, unfortunately, is unclear and incomplete on Gonzales' availability. The evidence of which we have been made aware, however, does suggest that although Carranza's attorney saw the witness, he was unable to interview him because of language and logistical problems that the government did not correct before his prompt departure.

In view of the inadequacy of the record on the opportunity to interview the witness and on the "material and favorable" nature of Gonzales' testimony, however, we heed the Supreme Court's advice and remand for a hearing on these issues. In *Valenzuela-Bernal*, the Court stated that in some cases "the criminal defendant may advance additional facts, either consistent with facts already known to the court or accompanied by a reasonable explanation for

their inconsistency with such facts, with a view to persuading the court that the testimony of a deported witness would have been material and favorable to his defense." *Id.* . The district court upon remand should insure that appellant's "explanation of materiality" is "verified by oath or affirmation of either the defendant or his attorney." *Id.* (citing Fed.R.Evid. 603; Fed.R.Crim.P. 47.)

After the district court has heard the evidence, it may impose the sanction of dismissing the indictment if "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." 458 U.S. at 874, 102 S.Ct. at 3450 (citing, *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). In making the decision to dismiss the indictment the district court

> should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself. Because determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer ruling on motions until after the presentation of evidence.

*Id.* The Supreme Court further instructed that the absence of the witness "must be evaluated in the context of the entire record." *Id.* at 874 n. 10, 102 S.Ct. at 3450 (citing *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

In accordance with *Valenzuela-Bernal,* therefore, we remand to the district court for a hearing on the questions of Gonzales' favorable and material testimony and of Carranza's opportunity to interview the witness before the government facilitated his departure. Should the district court find that the government deprived Carranza of an opportunity to interview a favorable and material witness, dismissal of the indictment would be warranted. If, after a hearing, the district court finds that the government did not so deprive Carranza, then the sanction of dismissal would not be appropriate. Because we also find error in the district court's failure to provide a vol-

untariness instruction, however, Carranza would still be entitled to a new trial. Accordingly, we hereby vacate and remand Carranza's convictions for proceedings consistent with this opinion.

## XII

### Failure to Disclose Jury Lists

Appellants contend that the district court erred in denying their motion to inspect and copy the names, addresses and questionaires of the grand jurors who returned the indictments against them. The district court found that the appellants were "only entitled to the Master Lists from which the Grand Jurors are drawn, together with the relevant demographic data."

 In determining whether the district court erred, we begin with the proposition that 28 U.S.C. § 1867(f) (Supp.1984), grants a defendant an "unqualified right to inspect jury lists." *Test v. United States,* 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975). That section provides:

> The contents of records or papers used by the jury commission or clerk in connection with the jury selection process shall not be disclosed, except ... as may be necessary in the preparation or presentation of a motion under ... this section .... The parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion.

In *Test,* the Supreme Court vacated the defendant's conviction and remanded for inspection of jury selection records based upon this "unqualified" right. "Without inspection," the Court concluded,

> a party almost invariably would be unable to determine whether he has a potentially meritorious jury challenge. Thus, an unqualified right to inspection is required not only by the plain text of the statute, but also by the statutes overall purpose of insuring "grand and petit juries selected at random from a fair cross-section of the community."

*Id.* at 30, 95 S.Ct. at 750–751 (quoting 28 U.S.C. § 1861). The right to inspection extends to all jury selection materials relevant to a complete determination of whether a grand or petit jury has in fact been selected "at a random from a fair cross-section of the community." *Id.; United States v. Lawson,* 670 F.2d 923 (10th Cir. 1982); *United States v. Hubbard,* 474 F.Supp. 64 (D.D.C.1979). We can certainly envision a situation in which a defendant must be afforded access to the names, addresses, and demographics of those jurors who returned the indictment in order to vindicate the "unqualified" right to inspection and to insure that the jury actually represented a wide spectrum of the community. *See, e.g., Collins v. Walker,* 329 F.2d 100 (5th Cir.), *cert. denied,* 379 U.S. 901, 85 S.Ct. 189, 13 L.Ed.2d 175 (1964). In the particular situation before us, however, we conclude that appellant's unqualified right to inspection was satisfied by disclosure of the Master Lists and the relevant demographic data about the general pool from which the specific grand jurors were selected. While Congress intended through § 1867(f) to insure that the national interest in fair and impartial juries receive primacy over the interest in grand jury secrecy, *see Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), we find that on the narrow facts currently before us appellants received sufficient information from which to carry out that Congressional intent. We hold, therefore, that the district court did not err in refusing to provide appellants with the names, addresses, and demographics of the specific grand jurors who returned the indictment against them.

## XIII

### The Plain View Seizure of the Brown Calendar and Note Pad

Appellants McLernon and Farrell contend that the district court erred in finding that the note pad and brown calendar seized from their hotel room were admissible pursuant to the "plain view" exception to the Fourth Amendment's warrant requirement. After a hearing on appellant's Motion to Suppress, the district court concluded that "the note pad and brown calendar are admissible under the plain view doctrine." (App. 66a). The court found that after his arrest McLernon led DEA agents Powell and Kusen back to the hotel room where he and Farrell were staying. Farrell "consented to the agents' entry into the room." (App. 65a). While in the room, agent Powell observed on the bed a calendar with airplane tickets and other papers and on the telephone stand a note pad with the number "126" written on top. When Farrell voluntarily agreed to accompany Powell and Kusen to DEA headquarters for questioning, the agents seized the calendar and the note pad. At the time of that seizure, Farrell was neither under a charge nor the subject of the agents' "probable cause" to believe she had engaged in criminal activity.

We must determine, therefore, whether the warrantless seizure of her property was justified under the "plain view" exception. In *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the Supreme Court initially explored the plain view doctrine. In that plurality opinion, the Court stated that in order to seize evidence pursuant to the "plain view" exception, executing officers must demonstrate (1) a prior valid intrusion, (2) an inadvertent discovery, and (3) that the evidence of an unlawful act was "immediately apparent" to them. The *Coolidge* analysis, which has been completely adopted by this Court, *see United States v. Gray,* 484 F.2d 352 (6th Cir.1973), *cert. denied,* 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974); *United States v. Truitt,* 521 F.2d 1174 (6th Cir.1975), was reaffirmed by the Supreme Court in *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Appellants do not, nor could they successfully, contend that the agents' prior intrusion into the hotel room was invalid or that their discovery of the seized items was advertent.

The issue before us, therefore, is whether the agents' probable cause to believe

that the note pad and calendar were incriminating was "immediately apparent" to them upon their "plain view" of these objects. *See Brown,* 460 U.S. at 737, 103 S.Ct. at 1540. In *Brown,* the Supreme Court stated that "it must be 'immediately apparent' to the police that the items they observe may be evidence of a crime ...." 460 U.S. 737, 103 S.Ct. at 1540. The Court then examined the police activity in that case and determined that probable cause was both immediate and apparent to the officer from his plain view of a tightly-knotted party balloon suspiciously placed in between the defendant's fingers. Probable cause was "immediate," the Court found, because it was the direct result of the officer's instantaneous sensory perception of the object. Probable cause, moreover, was "apparent" to the officer because no "innocent item" is "commonly carried in uninflated tied-off balloons." *Brown,* 460 U.S. at 746, 103 S.Ct. at 1545 (Powell, J. concurring).

The "immediately apparent" test developed in *Brown* is consistent with this Court's earlier cultivation of that test in *Gray* and *Truitt.* In *Gray,* we declared unconstitutional the seizure of rifles from the defendant's closet because the incriminating nature of the seized evidence was neither "immediate" or "apparent" to the executing officers. This Court concluded initially that because the "rifles were not contraband" the officers' probable cause could not have been "apparent" from their "plain view" of the items. 484 F.2d at 355. Yet, even if the incriminating nature of the rifles had been "apparent," the *Gray* Court concluded that the appearance of criminality was not "immediate." We found that

> ... the officers *at that time* [did not] have any knowledge of any other crimes. It was only after Trooper Brodt had seized the weapons, copied down the serial numbers, left the defendant's premises, and then run the information taken off the rifles through the National Crime Information Center that he learned that

they were stolen and hence incriminating.

484 F.2d at 355 (emphasis added).

In *Truitt,* we applied this same "immediately apparent" test to the facts of that case, but found that the seizing officers' probable cause was both "immediate" and "apparent" to them from their "plain view" of the seized objects. In upholding the warrantless seizure of a sawed-off shotgun, this Court determined that the officers could reasonably derive probable cause to believe that the evidence was incriminating from the very moment they "first discovered" the object. 521 F.2d at 1176–77. The officer's knowledge of the incriminating nature of the shotgun in *Truitt,* thus, was "immediate." We concluded in addition that the criminal nature of the possession of an "intrinsically" suspicious shotgun was "apparent" from mere observation of the object:

> "... a sawed-off shotgun in private hands is not an intrinsically innocent object. The possession of it is a serious crime, except under extraordinary circumstances."

521 F.2d at 1177 (quoting *Porter v. United States,* 335 F.2d 602, 607 (9th Cir.), *cert. denied,* 379 U.S. 983, 85 S.Ct. 695, 13 L.Ed.2d 574 (1964)). In direct contrast to the seizure in *Gray,* the seizure in *Truitt* was performed in a situation in which probable cause was both "immediate" and "apparent" to the officers from the intrinsically incriminating nature of the object found in "plain view." Although *Gray* and *Truitt* reached different results, the legal standards which they employed were identical. That standard, moreover, was applied by the Supreme Court in *Brown.*

Our review of *Gray, Truitt* and *Brown,* therefore, led us to conclude in *United States v. Szymkowiak,* 727 F.2d 95 (6th Cir.1984) that where the government attempts to excuse the warrantless seizure of evidence under the "plain view" exception, a reviewing court must "determine whether, under the circumstances of each case, probable cause was both 'immediate' and 'apparent' to the executing officers from

the nature of the object viewed." In *Szymkowiak*, we found that the agents' probable cause to connect a seized rifle with criminal activity was not "immediate" because those agents could not from their instantaneous sensory perception, *see Coolidge*, 403 U.S. at 470, 91 S.Ct. at 2040, of the item *"at the time"* of discovery, *see Gray*, 484 F.2d at 356, determine whether its mere possession was unlawful. *Szymkowiak*, 727 F.2d at 98–99. Moreover, we found, that the criminal nature of the weapon was not facially "apparent" to the observing agents from its *"intrinsic nature."* 727 F.2d. at 99. The agents rather had to view the *interior* of the rifle in order to determine whether it could be evidence of a crime.

This "immediately apparent" test, as it has been developed by this Court and by the Supreme Court, provides two crucial safeguards against abuse of the "plain view" exception to the Fourth Amendment warrant requirement. The requirement that probable cause be both "immediate" and "apparent" obviates the risk "inherent in such a situation that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." *See Brown*, 460 U.S. at 748, 103 S.Ct. at 1546, (Stevens, J. Concurring); *Coolidge*, 403 U.S. at 470–71, 91 S.Ct. at 2040–2041. The "immediate" and "apparent" test, furthermore, protects individuals against the possibility that officers acting without a warrant—without the authority of the rule of law—will have time and scope to fabricate a plausible justification for an otherwise arbitrary and extensive search or seizure. *See id.*

In the case before us, therefore, we must determine whether the agent's probable cause to believe that the seized note pad and calendar were incriminating objects was both "immediate and apparent" to them from their plain view of those objects. The district court, after hearing evidence on the motion to suppress this evidence, concluded that these items were admissible under the "plain view" doctrine,

but concluded that "the packet of cocaine found within the calendar" was not admissible under that doctrine.

In so concluding, however, the Court failed to apply the "immediate and apparent" test required by *Coolidge, Gray, Truitt, Brown,* and *Szymkowiak*. The district court instead apparently understood the Supreme Court's *Brown* decision to have "qualified" the "immediately apparent" test "by holding that the police need only have probable cause to believe the seized item has criminal significance or evidentiary value ...." Our decisions predating and post-dating *Brown*, however, and the majority in *Brown* itself, have not only unequivocally adhered to the "immediately apparent" test, but have embellished that test. We find absolutely nothing in the Supreme Court's *Brown* decision to undermine the policies, principles and precedents which require us to determine whether the agents' probable cause to believe the note pad and calendar were evidence of a crime was both immediate and apparent to them upon their "plain view" of the objects. The note pad and the calendar themselves were undoubtedly in "plain view."

Yet, we find that probable cause of criminality was neither immediate nor apparent to the agents from their plain view of the items. Unlike the sawed-off shotgun in *Truitt* and the knotted balloon in *Brown*, the note pad and calendar in this case were hardly "intrinsically" incriminating. Indeed such items are found in plain view of virtually every desk across this country. We do not, and cannot, subscribe to a rule of law which allows officers of the state to seize an item as evidence *merely* because it is in "plain view." *See Coolidge*, 403 U.S. at 470, 91 S.Ct. at 2040. The agents' "immediate" sensory perception, *see id. at* 471, 91 S.Ct. at 2040, must produce probable cause of crime. In the case at bar, the agents' "immediate" perceptions produced only visual images of two "intrinsically innocent" items. *Cf. Truitt*, 521 F.2d at 1176–77; *Gray*, 484 F.2d at 1174. We are unable to conclude, therefore, that the

agents *at the time* of perception, had probable cause to believe a note pad and a calendar were incriminating. *See Brown,* 460 U.S. at 748, 103 S.Ct. at 1546 (Stevens, J. Concurring).

We conclude in addition that such probable cause was never "apparent" to the officers from their "plain view" of the objects. The district court suppressed the cocaine found inside the calendar because it was not "apparent" to the officers from their perception of the items seized. The dates, notes, and airplane tickets also found *inside* the calendar and note pad, however, must have been equally non-apparent to the seizing officers. The note pad and the calendar themselves are not incriminating evidence, but the writings *interior* to these items were of evidentiary significance. These writings, like the suppressed cocaine, could not have been "apparent" to the agents from their "plain view" of the exterior of the note pad and the calendar. Like the agents in *Gray* and *Szymkowiak,* therefore, the agents in this case did not acquire probable cause of criminality until *after* they seized and examined evidence not "immediately apparent" to them. We conclude, therefore, that the evidence contained inside the calendar should have been suppressed because the agents' probable cause was neither "immediate" nor "apparent" to them from their "plain view" of the objects. Accordingly, we reverse the district court's denial of the motion to suppress these items.

## XIV

### Conclusion

Hence, after consideration of each of the issues presented by this appeal we hereby affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

This Court finds that the district court did not err in admitting Valdez's pre-arrest statements. We further conclude that sufficient evidence supports Valdez's Travel Act convictions as well as his § 843(b) convictions. Moreover, Valdez, cannot avoid any of his convictions with the defense of "vicarious entrapment" or entrapment as a matter of law. We find no error with respect to Valdez in the district court's entrapment instruction. Neither do we find error in the district court's failure to charge on multiple conspiracies, restrictions upon defense counsel's cross-examination of government witnesses, exclusion of Dr. Titchener's expert testimony, and refusal to disclose the names, addresses, and demographics of the specific grand jurors who returned the indictments. Accordingly, the judgment entered against Valdez is hereby AFFIRMED.

This Court does, however, conclude that appellant Yaqui was entrapped as a matter of law. Yaqui's conviction on one count of conspiracy, for which he received a sentence of fifteen years imprisonment, therefore, is hereby REVERSED.

Furthermore, this Court finds that the district court erred in failing to issue a voluntariness instruction in regard to appellant Carranza and in failing to afford Carranza a hearing on the circumstances surrounding the departure of witness, Alejandro Gonzales. We therefore, REMAND this cause to the district court for a hearing pursuant to *United States v. Valenzuela-Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), and the instructions contained herein. If that hearing does not result in the dismissal of Carranza's indictment, this Court finds that the district court's failure to issue a voluntariness instruction requires that Carranza be afforded a new trial. Accordingly, Carranza's convictions are hereby REVERSED and REMANDED for a hearing which will result in dismissal of the indictment or a new trial.

Finally, we conclude that the district court erred in failing to suppress the note pad and calendar. We, therefore, remand the judgments entered against appellants McLernon and Farrell for a new trial exclusive of these items and the evidence contained therein.

The judgments entered in the district court, therefore, are hereby AFFIRMED in

part, REVERSED in part and REMANDED with instructions consistent with this opinion.

WELLFORD, Circuit J., concurring in part and dissenting in part.

I concur with the majority in their disposition of the following issues:

I. Valdez's pre-arrest statements.

II. Sufficiency of evidence to support Valdez's conviction and absence of entrapment.

III. Travel Act convictions.

IV. Multiple conspiracy instruction.

V. Indirect entrapment.

VI. Entrapment.

VII. Expert testimony.

VIII. Restriction of appellant's cross-examination.

IX. Exclusion of taped conversations.

XI. The departure of witness Gonzales.

XII. Failure to disclose jury lists.

I disagree with the majority's handling of the issues of the voluntariness instruction and the plain view seizures. Accordingly, I dissent as to those two issues.

As for the voluntariness instruction, Carranza's principal contention at trial was that he never made the incriminating statements. He did testify that agent Palma shook his chair and made certain thinly veiled threats of abuse or torture. In spite of these alleged threats, however, Carranza emphatically denied making the incriminating statements. Further, Carranza first raised the allegations of threats in his direct-examination during the final week of trial. No such claims were made in Carranza's pretrial motion to suppress his statements. Nor was such assertion made at the pre-trial suppression hearing, at which agents Palma and Stuart testified and were available for cross-examination.

I conclude that voluntariness in this case was not a material nor a genuine issue. Credibility was the real issue and it was satisfactorily submitted to the jury. As in the case of *United States v. Lewis*, 565

F.2d 1248, 1253 (2d Cir.1977)[1], *cert. denied*, 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978):

> Defense counsel's obvious strategy at trial was ... to imply that the admission was not made at all, and counsel so argued to the jury. There was little, if any, evidence from which a jury could infer that the statement was involuntary. We have held that in these circumstances section 3501(a) ... does not require that the jury be specifically charged on voluntariness.

*See also United States v. Goss*, 484 F.2d 434, 437–38 (6th Cir.1973) (voluntariness instruction not required where question is not in issue), *United States v. Dye*, 508 F.2d 1226, 1232 (6th Cir.1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975) (voluntariness instruction unnecessary where issue not raised before the jury), *United States v. Groce*, 682 F.2d 1359 (11th Cir.1982) (voluntariness not pursued by defense—failure to instruct not plain error), *United States v. Mahar*, 645 F.2d 780 (9th Cir.1981) (no substantial jury evidence on voluntariness of confession—instruction not necessary), *United States v. Stevens*, 445 F.2d 304 (6th Cir.), *cert. denied*, 404 U.S. 945, 92 S.Ct. 298, 30 L.Ed.2d 260 (1971) (no substantial voluntariness issue raised—no need for instruction). The trial judge, therefore, did not err in respect to his instructions as to the statements made by Carranza.

I must also dissent from the majority's opinion that the seizure by DEA agents of a calendar and note pad in plain view in the hotel room shared by two appellants was a constitutional violation. As noted by Judge Jones:

> "the [trial] court found that after his arrest McLernon led DEA agents Powell and Kurew back to the hotel room where he and Farrell were staying. Farrell 'consented to the agents' entry into the room' (App. 65a). While in the room, agent Powell observed on the bed a calendar with airplane tickets and other papers and on the telephone stand a note

1. This was the same court that had earlier decided *United States v. Berry*, 518 F.2d 342 (2d

Cir.1975), a case relied upon by the majority.

pad with the number '126' written on top."

Co-defendant Valdez's room at the same hotel was #126, a fact known by the agents. Appellants concede that two prongs of a test set out in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) for the plain view exception in cases of a warrantless search are met in this case.[2] I would find also in this case that the probable incriminating nature of the pad and the calendar was apparent at the time to these experienced officers, and they had "probable cause" to seize those items. It was not necessary, as indicated by the majority, for the officers then to have probable cause to arrest Farrell. The four judge plurality in *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) clearly indicated that use of the expression "immediately apparent," in *Coolidge, supra*, did not mean that the officers "must be possessed of near certainty as to the seizable nature of the items" involved. 103 S.Ct. 1542. Use of the phrase, "immediately apparent" was observed to be "very likely an unhappy choice of words since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." 103 S.Ct. at 1542. *See Colorado v. Bannister*, 449 U.S. 1, 3–4, 101 S.Ct. 42, 43–44, 66 L.Ed.2d 1 (1980); *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

There was probable cause for the DEA officers to seize this evidence within their sight and ken when they were admitted into the hotel room. As noted in *Payton:*

> [t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming there is probable cause to associate the property with criminal activity.

445 U.S. at 587, 100 S.Ct. at 1380.

The Supreme Court discussed the "particularized suspicion" of officers in *Texas v. Brown:*

Moreover, our observation in *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), regarding "particularized suspicion," is equally applicable to the probable cause requirement:

> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."

103 S.Ct. at 1543.

There was certainly "particularized suspicion" on the part of the DEA officers at the time they entered the room which had been occupied by McLernon. The officers saw the objects in question without looking into drawers, clothing, or suitcases where privacy interests are apparent.

Even if one analyzes the facts of the search and seizure here under the minority concurrence rationale of Justice Stevens[3] in *Texas v. Brown*, the plain view exception applies. Justice Stevens observed, following the *Coolidge* plurality view:

> An object may be considered to be "in plain view" if it can be seized without compromising any interest in privacy.
>
> . . . . .
>
> ... seizing the item must entail *no significant additional invasion of privacy,* and at the time of seizure the officer must have probable cause to connect the item with criminal behavior. (emphasis added).

103 S.Ct. at 1546.

There was not, in my view, any significant additional invasion of privacy by the

---

**2.** There was (1) a prior valid intrusion; and (2) an inadvertent discovery.

**3.** Joined by Justices Brennan and Marshall.

seizure of objects observed after a valid, consentual intrusion, where the discovery of these items was purely inadvertent and unplanned. The items seized were reasonably connected with criminal behavior (travel with drugs) and with another defendant, Valdez, already in custody on drug charges.

The *Brown* plurality did *not* hold, as intimidated by Judge Jones, that it must be immediately apparent to the police that the items they observe may be evidence of a crime. Rather, they observed that the opinion of another plurality in *Coolidge* was a "point of reference for further discussion of the issue" and of the meaning and proper construction of the expression, "immediately apparent." 103 S.Ct. at 1540. Indeed, some courts have indicated that *Brown* modified the *Coolidge* test. Discussing *Brown*, the Ninth Circuit recently wrote: "[T]he court reconsidered the *Coolidge* plurality's 'immediately apparent' language and substituted a probable cause standard." *United States v. Issacs*, 708 F.2d 1365, 1369 (9th Cir.1983) *cert. denied,* — U.S. —, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983). *See also, United States v. Pajari,* 715 F.2d 1378, 1384 (8th Cir.1983); *United States v. McDonald,* 723 F.2d 1288, 1295 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984); *United States v. Reed,* 726 F.2d 339, 343 (7th Cir.1984).

The DEA officers, in my view, did have "probable cause to connect" the note pad and the calendar items "with criminal behavior." They did not have any occasion, in seizing these items, to rummage through private or personal effects such as containers, purses, or envelopes. The cocaine packet hidden inside the calendar was appropriately suppressed; I would hold, however, that the pad and calendar and notes thereon were properly seized under the rationale of *Texas v. Brown, supra,* as did the district court.

Accordingly, I would affirm the district court's denial of the motion to suppress these items. If, upon remand, the district court finds that Carranza's indictment

should not be dismissed after the *United States v. Valenzuela-Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) hearing, I would affirm his conviction. I would not grant McLernon and Farrell a new trial for the reasons indicated, but would affirm their convictions.