**UNITED STATES of America,
Plaintiff,**

**v.**

**Pin Yen YANG, et. al., Defendants.**

**No. 1:97 CR 288.**

United States District Court,
N.D. Ohio.

Nov. 17, 1999.

Marc Zwillinger, David E. Green, Washington, DC, for Plaintiff.

Arland T. Stein, Reed, Smith, Shaw & McClay, Pittsburgh, PA, Nancy Luque, Eric A. Dubelier, Reed, Smith, Shaw & McClay, Washington, DC, Ralph E. Cascarilla, Darrell A. Clay, Walter & Haverfield, Cleveland, OH, James D. Robenalt, David J. Hooker, Thompson, Hine & Flory, Cleveland, OH, John B. Quinn, Quinn, Emanuel, Urquhart & Oliver, Los Angeles, CA, for Defendants.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

On October 15, 1999, an evidentiary hearing was held in this matter on the Joint Motions of Defendants Pin Yen Yang ("P.Y.Yang"), Hwei–Chen Yang ("Sally Yang"), and Four Pillars Enterprise, Co. ("Four Pillars") for a new trial or in the alternative for reconsideration of their motion for a mistrial (Dkt.# 347 & # 351). The Defendants have moved for a new trial on three grounds. First, the Defendants contend that Dr. Lee testified falsely at trial and that his testimony concerned material exculpatory evidence. Alternatively, the Defendants argue that they were not able to cross-examine Dr. Lee concerning his false testimony. Second, the Defendants contend that the Government's failure to notify them that Dr. Lee

had undergone treatment for mental health problems during the investigation, "sting," and prosecution of the Defendants constituted a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finally, the Defendants assert that Dr. Lee's false testimony and mental health situation affected their ability to present an entrapment defense.

For the following reasons, Defendants' Motions (Dkt.# 347 & # 351) are DENIED.

## FACTS

### The Indictment

On October 1, 1997, the Government filed a twenty-one count indictment against P.Y. Yang, his daughter Sally Yang, and their company Four Pillars charging them with eight counts of mail fraud, five counts of wire fraud, two counts of money laundering, one count of conspiracy to launder money, and three counts of receipt of stolen goods. The Defendants were also charged with one count of conspiracy to steal trade secrets and one count of attempting to steal trade secrets in violation of the Economic Espionage Act ("EEA").

The Government's case against the Defendants was essentially focused on the Defendants appropriation of proprietary and confidential information from the Avery Dennison Corporation ("Avery"). Avery's principal business is the production and sale of self-adhesive materials such as labels and tapes. Defendant Four Pillars, a Taiwanese company, marketed the same products in the Far East. Avery invests substantial sums of money into researching and developing products for sale in various markets worldwide. To protect its investment, Avery undertook substantial security measures to properly preserve the confidentiality of its proprietary information. However, Avery was not able to protect itself from one of its own employees, Dr. Ten–Hong "Victor" Lee ("Dr. Lee")· and the Defendants.

Dr. Lee was an employee of Avery beginning in May 1986. From the time Dr. Lee began working at Avery until he was caught passing confidential information to the Defendants, he executed five Conflict of Interest and Legal and Ethical Conduct questionnaires attesting, among other things, that he was not employed by another entity or person, that he did not provide his services to a competitor, and that he did not use or allow others to use Avery's confidential and proprietary information for his personal advantage. Dr. Lee, a research chemist, was privy to Avery's confidential and proprietary information and documents and used his position to surreptitiously provide valuable information regarding Avery adhesives to the Defendants.

In July 1989, Dr. Lee was asked by P.Y. Yang, the President of Four Pillars, to serve as a "consultant" for his company. Lee was paid $25,000 for his services by Four Pillars before he left Taiwan. The funds were deposited into a Taiwanese bank account in the name of Lee's mother-in-law. This was the start of a long relationship between Dr. Lee and the Defendants. Over the course of the next eight years, Dr. Lee provided confidential and proprietary information to Four Pillars, via the U.S. Mail, in exchange for money. This relationship lasted until September 4, 1997, when the Government arranged, with Dr. Lee's cooperation, to videotape a meeting between the Defendants and Dr. Lee. At the meeting Dr. Lee was to provide the Yangs with Avery trade secrets.

For the purpose of giving the Government's sting operation context, a brief summary of the facts leading up to it is necessary. In January 1997, Dr. Lee obtained Avery's confidential business plan regarding activities in the Far East with the intent to disclose its contents to Defendants. Dr. Lee's activities were subsequently discovered by the Federal Bureau of Investigation ("FBI") and Avery. Dr. Lee then agreed to cooperate in the inves-

tigation of Defendants which eventually led to the sting operation.

On August 3, 1997, Dr. Lee telephoned P.Y. Yang to confirm his plans for a visit to the United States in September 1997. Dr. Lee informed P.Y. Yang that he would be able to obtain detailed information about new emulsion adhesive technology and needed to discuss it personally with P.Y. Yang. P.Y. Yang told Dr. Lee that he was also interested in Avery's business plans for the Far East.

On August 31, 1997, P.Y. Yang telephoned Dr. Lee. Upon returning P.Y. Yang's call, Dr. Lee arranged a meeting with P.Y. Yang and Sally Yang in Westlake, Ohio, where Avery's confidential and proprietary information would be turned over to them. The next day, September 1, 1997, Dr. Lee finalized these plans.

On September 4, 1997, Defendants P.Y. and Sally Yang met with Dr. Lee in a hotel room in Westlake, Ohio. The entire meeting between Dr. Lee, P.Y. Yang, and Sally Yang was captured by the FBI on video tape. (Government Exhibit 73.) The video tape clearly showed P.Y. and Sally Yang cutting out the confidential markings on the documents they believed to contain an Avery patent application.

### The Verdict

Counts 1 through 6 and Counts 9, 10, 14, 15, and 18, were dismissed on the Defendants' motion for a judgment of acquittal pursuant to FED. R. CRIM. P. 29 (Dkt. # 314). Additionally, the Government's motion for leave to dismiss Counts 8, 11, 12, 13, 16, 17, and 19 of the Indictment pursuant to FED R. CRIM. P. 48 was granted (Dkt. 291, 292).

The Jury returned a verdict on April 28, 1999, of not guilty on Count 7—mail fraud. The Jury, however, convicted the Defendants on the Economic Espionage Act Counts: conspiracy to steal trade secrets (Count 20) and attempted theft of trade secrets (Count 21).

### Dr. Lee's Subsequent Admission of Perjury

On August 19, 1999, Dr. Lee was deposed in connection with a civil case filed by Avery against P.Y. and Sally Yang and Four Pillars. At that deposition, Dr. Lee was asked questions about Government Exhibit 19 which was admitted at the criminal trial. Additionally, when Dr. Lee was questioned about another Government Exhibit, Exhibit 17, which was also received in evidence at the criminal trial, he invoked his Fifth Amendment privilege.

#### 1. Government Exhibit 19

At trial, Dr. Lee, on direct examination by the Government, identified Exhibit 19 as a copy of a letter written to him by Sally Yang in 1990. A copy of this document, in its original form, was in the Defendants possession prior to trial. Dr. Lee testified that the photocopy used by the Government was identical to the original document he provided to the FBI. (*See* Trial Tr. 932–933.) Dr. Lee testified affirmatively that he had supplied the original letter to the FBI and had not altered Exhibit 19 aside from a date marking on the top of the first page. (*See* Trial Tr. at 932–33, 942–48, 951–52.) The Court admitted Government Exhibit 19.

On August 19, 1999, during a deposition being conducted in Avery's civil suit against Defendants, Dr. Lee was asked whether he had provided the original of Government Exhibit 19 to the FBI. (*See* Civil Depo. Tr. 173–177.) Dr. Lee neither directly nor immediately answered the question posed by Defense Counsel. Dr. Lee was questioned further after being shown Defendants' Civil Exhibit 74, which was the full text version of the redacted document introduced at trial as Government Exhibit 19. A comparison of Civil Deposition Exhibit 74 and Trial Exhibit 19 shows that a portion of the original document had been redacted and the signature line moved up on the page to cover the alteration. It became apparent that it was

the redacted copy that was admitted at trial as Government Exhibit 19.

When pressed by Defense Counsel, Dr. Lee could not offer an explanation for the discrepancy between the documents. (*See* Civil Depo. Tr. 177–181.) Eventually, Dr. Lee admitted that he altered the document introduced at the criminal trial as Government Exhibit 19 prior to turning it over to the FBI. (*See* Civil Depo. Tr. at 183–184.) Dr. Lee then asserted his Fifth Amendment privilege to nearly every substantive question asked thereafter by Defendants' Counsel until the deposition ended. (*See* Civil Depo. Tr. at 182–191.)

### 2.   Government Exhibit 17

Defendants have also produced evidence that Government Exhibit 17, introduced and admitted at trial, was also altered by Dr. Lee. Exhibit 17 is a letter sent to the Defendants by Dr. Lee. The Defendants maintained the original in their possession throughout the trial. Apparently, the Defendants' original of Government Exhibit 17 contains six pages—two more than the trial exhibit offered by the Government. The document offered by the Government at trial ends at page four where Dr. Lee's signature appears. Dr. Lee testified that Exhibit 17 was a copy of a letter he sent to P.Y. Yang and others. Exhibit 17 was first used in an attempt to refresh Dr. Lee's recollection about a telephone conversation he had with someone at Four Pillars in November 1989. (*See* Trial Tr. 893:13–17.) Exhibit 17 was then admitted by the Court based on Dr. Lee's testimony that the copy was identical to the original he sent to the Defendants. (*See* Trial Tr. 893:13–17.)

At the civil deposition, Defense Counsel was prohibited from inquiring about the inconsistency in Dr. Lee's testimony regarding Exhibit 17. Dr. Lee invoked his Fifth Amendment privilege to nearly every question asked of him after admitting to testifying falsely about Exhibit 19.

### Dr. Lee's Mental Health

The Defendants argue that the Government failed to disclose to them that immediately after his arrest and again in the summer of 1998, Dr. Lee was treating with mental health professionals. The Defendants were permitted by the Court to view Dr. Lee's mental health records and file a sealed post-hearing brief that contained their arguments as to why Dr. Lee's mental health records were material to the outcome of this case. The Government, which also had access to Dr. Lee's mental health records, filed its own sealed post-hearing brief in support of its position that a new trial is not warranted. The Government summarized the relationship between Special Agent Bartholomew and Dr. Lee in connection with Dr. Lee's mental health and his treatment for depression and anxiety.

The Government asserts that mental health services were recommended to Dr. Lee, at his request, by Special Agent Bartholomew in late March or early April 1997. Dr. Lee reported to Agent Bartholomew that he had visited the psychologist and received counseling. Dr. Lee later informed Agent Bartholomew that he had terminated his counseling. The Government further argues that Dr. Lee never informed Agent Bartholomew of any diagnosis received by Dr. Lee and has never seen Dr. Lee's records for the consultations.

At the evidentiary hearing, Agent Bartholomew testified that he frequently asked Lee about his well-being. Dr. Lee also informed Agent Bartholomew that he was very concerned about his future and his family and that Agent Bartholomew believed that Lee was feeling depressed due to his circumstances. (*See* Evid. Hrg. Tr. 37:2–7 and 29: 15–20.) The Government contends that Agent Bartholomew has no notes regarding these or any other discussions with Lee about his emotional or mental health. Furthermore, the Government asserts that throughout Dr. Lee's cooperation with the Government, he did

not tell Bartholomew that he ever considered harming himself or others; nor did Lee ever report experiencing hallucinations or delusions.

In the summer of 1998, following the sting of the Defendants, Dr. Lee told Agent Bartholomew that he was feeling sad and discouraged and that he was not receiving counseling for his feelings. Dr. Lee also indicated that he had no health insurance coverage. Agent Bartholomew informed Dr. Lee that mental health services were available at no cost. (*See* Evid. Hrg. Tr. 40:9–13.) At Dr. Lee's request, Agent Bartholomew accompanied him to a community mental health center named Pathways. Dr. Lee later told Agent Bartholomew that he had been referred to a psychiatrist. The psychiatrist prescribed medication which he only took once. (*See* Evid. Hrg. Tr. 42:3–8.) The Government asserts that Agent Bartholomew does not recall being told what medication Lee had received. (Govt's Post–Hrg. Memo at 18; *see* Evid. Hrg. Tr. 36:11–15, 132:20–133:7.) Most importantly, the Government argues that Agent Bartholomew has never reviewed any of Dr. Lee's medical records from any mental health provider and was never informed of any diagnosis of Dr. Lee. (Govt.'s Post–Hrg. Memo at 18; *see* Evid. Hrg. Tr. 35:25–36:1.)

The Defendants contend that the evidence of Dr. Lee's mental health condition and treatment was material impeachment evidence. (*See* Memo in Support of Supplemental Joint Mot. for New Trial at 5–7.) The Defendants further assert that the Government possessed information relating to Dr. Lee's mental condition and treatment and should have disclosed such information to them prior to trial. (*See* Memo in Support of Supplemental Joint Mot. for New Trial at 3–5.) The Defendants surmise that had the Court known of Dr. Lee's mental health an *in camera* inspection of Lee's medical records would have been held. The Defendants contend that had they been permitted to review Dr. Lee's mental health records prior to trial, significant material evidence would have been discovered that would have substantially affected the trial and its outcome.

The Defendants also argue that had evidence of Dr. Lee's emotional situation been disclosed before trial the Defendants' Counsel would have attempted to have portions of those records admitted at trial. The Defendants boldly assert that the Government intentionally and wilfully withheld the records because they were unfavorable to its position at trial. There is no evidence that supports such a claim.

The Defendants point out that Agent Bartholomew testified that he initiated a conversation on the subject of mental health counseling for Dr. Lee. (*See* Evid. Hrg. Tr. 33:6–19; 34:5–9.) Rather than advise Dr. Lee to obtain legal counsel about his "concerns or fears," the Defendants contend that Agent Bartholomew referred Lee to Dr. Carol Gee in March of 1997, for counseling. Furthermore, Agent Bartholomew testified that he told at least one of the prosecutors of his referral. (*See* Evid. Hrg. Tr. 33:10–35:20, 100:5–16.) Agent Bartholomew additionally testified that he was aware that Dr. Lee was being treated with prescription drugs at that time. (*See* Evid. Hrg. Tr. 36:9–15.)

According to Agent Bartholomew, when Dr. Lee expressed a desire to see a mental health professional again in the summer of 1998, he located an organization that provided Dr. Lee with free counseling. (*See* Evid. Hrg. Tr. 39:7–41:1.) Agent Bartholomew testified that he took Lee to the Pathways' facility and he met with the therapist and Dr. Lee. Agent Bartholomew admitted that he was aware that Dr. Lee was prescribed medication on this occasion as well. (*See* Evid. Hrg. Tr. 41:24–42:8.) Agent Bartholomew again informed the prosecutors that Dr. Lee was seeing a mental health professional. (*See* Evid. Hrg. Tr. 101:23–102:5.) Agent Bartholomew, however, maintains that he did not hear the prosecutors' question Dr. Lee about his mental health treatment during

trial preparation. (*See* Evid. Hrg. Tr. 104:10–105:1.)

The Defendants draw several conclusions from their review of Dr. Lee's medical records. First, the Defendants conclude that Agent Bartholomew discouraged Dr. Lee from contacting an attorney until the FBI and Avery Dennison finished investigating him. Additionally, the Defendants conclude that at least one of the prosecutors, Peter Toren, participated in the investigation of Dr. Lee as early as March 7, 1997, and should have known of Dr. Lee's mental health situation. (*See* Evid. Hrg. Tr. 12:7–8.) Finally, the Defendants assert that the records establish that during the course of Dr. Lee's cooperation with the government, consent to electronic monitoring and trial preparation, Lee, at various times took two, and possibly three different prescription medications.

### Dr. Lee's Mental Health Records

The Court has reviewed Dr. Lee's mental health records *in camera*. At the evidentiary hearing, the Court provided copies of Dr. Lee's medical records to the Government and Defense Counsel and ordered that they file their arguments under seal. The documents themselves and the post-hearing sealed briefs of the Government and Defense Counsel have been made part of the record. The documents reviewed by the Court include:

- Letter from Dr. Carol Gee, May 19, 1997

- Treatment Notes of Dr. Gee, March 3, 1997 to December 4, 1997

- Treatment Notes from Pathways, Inc. beginning April 22, 1998

- Letter from Niels W. Nielsen of Path-Care, September 22, 1999

The Court has considered and weighed the issue of Dr. Lee's mental health records as they relate to the disposition of the pending motions.

### Dr. Lee's Sentencing Hearing

The Defendants on November 10, 1999, filed a Notice of Intent to Supplement Defendants' Joint Motions for New Trial (Dkt.# 381). The Court permitted the Defendants to supplement the record in this case by submitting a copy of the transcript of Dr. Lee's sentencing. The Defendants, however, abused the Court's permission to supplement the record by filing additional arguments along with the transcript. The Court never granted leave to the Defendants to make such a filing and will not consider any arguments set forth in their Post–Hearing Supplemental Submission (Dkt.# 381).

### NEW TRIAL: DR. LEE'S FALSE TESTIMONY

██ The Defendants, in order to prevail on their joint motions for a new trial, must establish the following elements:

(1) the new evidence was discovered after the trial;

(2) the evidence could not have been discovered earlier with due diligence;

(3) the evidence is material and not merely cumulative or impeaching;

(4) the evidence would likely produce an acquittal.

*United States v. O'Dell,* 805 F.2d 637, 640 (6th Cir.) *cert. denied,* 484 U.S. 859, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987). *See United States v. Hawkins,* 969 F.2d 169, 175 (6th Cir.) *cert. denied,* 506 U.S. 1069, 113 S.Ct. 1021, 122 L.Ed.2d 168 (1993).

██ The Sixth Circuit has held that the first prong of the *O'Dell* test "requires the newly discovered evidence to be evidence not known by the defendant at the time of trial." *United States v. Seago,* 930 F.2d 482, 488 (1991). The Government strenuously argues that Defense Counsel, exercising due diligence, should have known that Exhibits 17 and 19 were altered by Dr. Lee at the time of trial. The Defendants have repeatedly asserted that they had no knowledge of the original content of Government Exhibits 17 and 19. (*See*

Affidavits of Nancy Luque, Eric A. Dubelier, Ralph E. Cascarilla, and Darrell A. Clay.) However, Defense Counsel have admitted that the original of Exhibit 17 and a copy of Exhibit 19 in its original form were in the Defendants' possession in Taiwan well before trial.[1] (Defts.' Joint Statement of Facts and Evid. at 4; Clay Affidavit.) Sally Yang actually wrote Exhibit 19 to Dr. Lee, and the Defendants received Exhibit 17 from him. Both letters were in the Defendants' possession as part of a larger collection of documents that were inspected and compiled by Counsel for Four Pillars, including Darrell Clay. Darrell Clay is current Counsel for Sally Yang and former Co-Counsel for Four Pillars. (See Defts.' Memo in Support of Motion for New Trial at 6–7; Clay Affidavit ¶ 4.) Therefore, Defense Counsel exercising due diligence in preparation for trial should have known of the content of these documents. As such, Defendants motion for a new trial based on newly discovered evidence fails on this element of the *O'Dell* test.

■■■■ Even assuming that the first two prongs of the *O'Dell* test have been satisfied, the Defendants have not shown that Dr. Lee's false testimony was material and would likely have resulted in an acquittal had it been presented to the jury. In determining whether the Defendants have met their burden on the last two prongs of the *O'Dell* test, the Court must apply either the "reasonable likelihood" or the "reasonable probability" standard. The choice between these standards depends on the "nature of the evidence and the culpability of the government." *United States v. Hawkins,* 969 F.2d at 175. Therefore, the Court must determine whether the Government knowingly used Dr. Lee's false testimony at trial, or should have known that it was false. If the Government knew or should have known of Dr. Lee's false testimony, "the conviction

will be set aside if there is any *reasonable likelihood* that the false testimony could have affected the judgment of the jury." *O'Dell,* 805 F.2d at 641 (*citing United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)) (emphasis added). If the Government did not know of Dr. Lee's false testimony at trial, "the evidence will be considered material and the conviction set aside 'only if there is a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *O'Dell,* 805 F.2d at 641 (*citing Bagley, supra* ) (emphasis added).

■■■ The Defendants have failed to show that the Government knew, or should have known, that Dr. Lee testified falsely concerning the content of Government Exhibits 17 and 19 at trial. The Defendants have not shown that the Government possessed the originals of Exhibits 17 and 19. If the prosecutors never had possession of the original documents, it would be impossible for them to know, and, therefore, they would not have known, that Dr. Lee testified falsely about their content.

Additionally, the Defendants have not proven that the Government knew or should have known that Dr. Lee testified falsely when he stated at trial that he gave all of the documents relating to this case to the FBI. (*See* Trial Tr. 1303:17–1304:9.) The Defendants assert that Dr. Lee did not give all of the documents to the FBI, but rather gave some to Avery. (*See* Defts.' Post–Hrg. Brief at 6.) The Defendants have not offered any proof that Dr. Lee in fact turned documents over to Avery during the investigation. Instead, the Defendants surmise that because Agent Bartholomew was required to go to Avery's outside counsel for copies of documents, those documents were not part of what Dr. Lee turned over to the FBI. The Defendants' position is without evidentiary support. Accordingly, the Defendants

---

1. With the original documents in their possession, the Defendants should have taken advantage of the Court's unusual permission to depose Dr. Lee before trial to explore the inconsistencies among the documents.

cannot show that the Government knew or should have known that Dr. Lee testified falsely about giving all of the documents in his possession to the FBI.

Because the Government did not know that Dr. Lee testified falsely at trial, the Court must determine "only whether there is a *reasonable probability* that, had the [false testimony] been disclosed to the defense, the result of the proceeding would have been different." *United States v. Hawkins,* 969 F.2d at 176 (emphasis added); *see also Schledwitz v. United States,* 169 F.3d 1003, 1012, *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2679, 129 L.Ed.2d 814, (1994). Such a determination hinges on whether the evidence was material to the outcome of the case, and not merely cumulative impeachment evidence. *See O'Dell,* 805 F.2d at 641 (*citing Bagley, supra* ). Additionally, any evidence not disclosed before or during trial must be considered collectively, rather than individually, to determine whether the "reasonable probability" test is met. *See Schledwitz,* 169 F.3d at 1012.

■ The two exhibits about which Dr. Lee falsely testified were not material to the Defendants' convictions on the two EEA counts. The Defendants were con-

victed of conspiring and attempting to steal trade secrets. Neither letter contained the trade secrets the Defendants conspired or attempted to steal nor did Dr. Lee's false testimony about the content of each of these letters have any bearing on the Government's ability to establish the requisite elements of each EEA offense.[2] Accordingly, Dr. Lee's false testimony would only have been impeachment evidence.

Whether Dr. Lee's false testimony is material and not merely cumulative impeachment evidence partly depends on the totality of the other evidence presented by the Government. The Sixth Circuit has held that where there is substantial evidence of guilt presented at trial, "it is not likely that further discrediting of [the witness] would produce an acquittal if the case was re-tried." *United States v. Terry,* 729 F.2d 1063, 1067 (6th Cir.1984). In *Terry,* the government's principal witness established an essential element of the case against the defendants.[3] On the third day of trial, the government learned that the witness arrived at the courthouse in a truck that contained stolen parts and was accompanied by a fugitive. *Id.* at 1066–67.

---

**2.** The elements of the conspiracy to steal a trade secret are:

(1) That the defendants knowingly conspired with one or more other persons;
(2) That the conspiracy was to steal a trade secret;
(3) That one or more of the people in the conspiracy did an act to effect the object of the conspiracy;
(4) That the defendants acted with the intent to convert a trade secret;
(5) That the trade secret was related to or included in a product that was produced for or placed in interstate or foreign commerce;
(6) That the defendants intended to economically benefit someone other than the owner of the trade secret.
(See Trial Tr. 2681:5–22.)
The elements of attempt to steal a trade secret are:
(1) That the defendants knowingly attempted to receive, buy or possess the patent application;

(2) That the defendants knew the patent application to have been stolen or appropriated, obtained or converted without authorization of Avery Dennison;
(3) That the defendants acted with the intent to convert a trade secret;
(4) That the defendants believed that the patent application was a trade secret;
(5) That the trade secret was related to or included in a product that was produced for or placed in interstate or foreign commerce;
(6) That the defendants intended to economically benefit someone other than the owner of the trade secret;
(7) That the defendants intended or knew that the offense would injure any owner of that trade secret.
(See Trial Tr. 2686:10–25, 2687:1–4.)

**3.** The witness testified that he agreed to give one of the defendants $5,000 for a stolen truck. One of the elements of the offense charged was that the truck must be worth $5,000. *See Terry,* 729 F.2d at 1066.

Both sides had rested and the district judge refused to re-open the case for the purpose of re-calling and discrediting the witness. *Id.* at 1067. The district judge also denied the defendants' motion for a new trial. *Id.* Prior to denying the new trial motion, it was revealed to the district court that the witness, who claimed to have told the jury everything about his criminal activity, lied on the stand and was still engaged in criminal activity at the time of his testimony. *Id.* Despite the false testimony of the Government's star witness, the convictions were upheld and the motion for a new trial was denied because the convictions were supported by substantial evidence and further impeachment would not likely have produced an acquittal.[4] *Id.*

In the case *sub judice,* the Government produced overwhelming evidence of the Defendants' guilt on the counts of conviction. The Government presented both documentary and videotape evidence. The documentary evidence is as follows:

- **Ex. 6/6A (Letter from Lee to P.Y. Yang dated July 31, 1989)**—Adhesive Formulations are included in the categories of information Lee will provide Four Pillars. Letter indicates that these categories of information were discussed in the meeting of July 20, 1989.

- **Ex. 7/7A (Letter from Lee to P.Y. Yang dated August 6, 1989)**—Lee discusses sending "two extremely confidential reports, which are the fruit of painstaking work of Avery research Center over a period of several years."

- **Ex. 9/9A (Letter from P.Y. Yang and Sally Yang to Lee, dated August 17, 1989)**—Letter acknowledges receipt of July 31, 1989 and August 6, 1989 letters. Part written by P.Y. Yang also promises to "give the information we've received proper book cover; then, Chen–Kang Kao, Hwei–Chen

and I will manage the data, and will handle it carefully even in our internal discussions."

- **Ex. 11/11A (Letter from Lee to P.Y. Yang, dated September 10, 1989)**—Letter provides the formula for "a new Acrylic formula (ingredients) which was developed by the Avery Research and has been used by Fasson recently." Letter describes the product as "a new weapon marketed as recent as September this year."

- **Ex. 21 & 22—Avery–Dennison Paper Applications and Specifications,** provided by Lee to Sally Yang in Newark, N.J. on February 24th and 25th, 1990.

- **Ex. 24/24A (Letter from Lee to P.Y. Yang, dated March 18, 1990)**—Letter confirms that Lee provided paper specifications to Sally Yang on February 24th and 25th, 1990. Letter describes these documents as confidential.

- **Ex. 25/25A (Letter from Lee to P.Y. Yang, dated April 5, 1990)**—Letter also confirms the provision of the paper specifications to Sally Yang. Lee asks that P.Y. Yang "treat F Company's paper specifications as extremely confidential and use them with caution."

- **Ex. 27/27A—Formulation information for GP–1 and S–246.**

- **Ex. 30/30A (Letter from Lee to P.Y. Yang, dated Dec. 16, 1990)**—Letter indicates that Lee discussed Hotmelt adhesive formulations with Mr. Chihlin (C.L.Kao) in November 1990.

- **Ex. 31 (Seminar Agenda July 1991)**—This agenda corroborates Lee's testimony that he provided formulation information from the Specialty Tape division in 1991.

- **Ex. 34A, 34B, 34C—Formulation information for removable adhesives and

4. *See United States v. Wong,* 78 F.3d 73, 82 (2d Cir.1996) ("[W]here independent evidence supports a defendant's conviction, the subse-

quent discovery that a witness's testimony at trial was perjured will not warrant a new trial.")

primer, provided by Lee and corroborated by his August 22, 1991 letter (**Ex. 36/36A**).

- **Ex. 39/39A (Letter from Lee to P.Y. Yang, dated January 6, 1992)**—Letter provides formulation information for Fasson's A1 adhesive. Lee specifically indicates that the adhesive "has a long history in F Company." Letter also promises to provide more formulation information for hotmelt adhesives.

- **Ex. 41 (Library of Documents sent by Lee to Four Pillars)**—This document corroborates Lee's testimony that he provided many confidential documents to Four Pillars, and proves the receipt of his letters by the defendants. This library shows also defendants' knowledge that the information came from Avery & Fasson. For example, items 56 & 57 are designated "ARC" and "STD." Items 29 & 79 are Fasson's paper specifications.

- **Ex. 52—Introduction to Thermal Silicones,** April 29, 1996. This document, bearing the Avery confidential and proprietary markings at the bottom of each page, also provides evidence of predisposition.

- **Ex. 66c, p. 6 (Transcript of April 6, 1997 call between Lee and P.Y. Yang).** This transcript shows that (i) P.Y. Young made the first contact with Lee after Lee began cooperating with the government, and (ii) Lee did not lure P.Y. Yang to the United States as P.Y. Yang was already planning to come to the United States before Lee ever suggested a meeting. This point is also established in **Ex. 69b, p. 1 (Transcript of August 3, 1997 call between Lee and P.Y. Yang)**

- **Ex. 69b, p. 2 (Transcript of August 3, 1997 call between Lee and P.Y. Yang).** This transcript demonstrates that even before the September 4, 1997 meeting, Lee had told P.Y. that he would be providing information obtained from the Avery Research Center.

Notwithstanding Dr. Lee's perjured testimony, the Government's documentary evidence of the Defendants' guilt was overwhelming.

In addition to the documentary evidence, the convictions were supported by the FBI sting videotape evidence. The relevant portions of the videotape are:

- **Ex. 73: 13:03:10—13:07:25**–This section corroborates that the defendants did receive the materials that Lee had been sending. It also demonstrates that Sally Yang was the section chief of the "Label" section at Four Pillars, that she was only on temporary leave in Singapore, and that she continues to work for Four Pillars in Taiwan.

- **Ex. 73: 13:22:15—13:23:22**—This section again corroborates that Lee previously provided Avery information, including formulas, to the defendants in the past. Yang refers to the collection of information as a "treasure box" and wonders if there are "unused hidden treasures."

- **Ex. 73: 13:43:19—13:44:43**—This section confirms that Lee had provided the defendants with information about removable adhesives in the past. It corroborates Ex. 34A, 34B, 34C & 36/36A.

- **Ex. 73: 13:50:54—13:58:24**—*Lee provides the Patent Application and describes it twice as a confidential document, and emphasizes that the filing is not available to the public. Lee indicates that it relates to an adhesive that can run at high speed. Yang points to the confidential stamp and directs Sally Yang to "Cut that out and make a copy."*

- *This section demonstrates that it took P.Y.Yang only 8 minutes from the moment that he was first offered the opportunity to commit the crime until he directed Sally Yang to cut out the confidential stamp from the Patent Application. This is the clearest, most unequivocal evidence*

*of predisposition found on the tape. This remark was not solicited in any way by Lee.*

- **Ex. 73: 14:14:00—14:18:00**—This section shows it was Yang, not Lee, who again brought up the subject of cutting the documents and was poised to cut the documents before any comment by Lee.

- **Ex. 73: 14:26:36**—P.Y. Yang directs Lee to take the clippings back to his house and dispose of them there.

- **Ex. 73: 14:38:00—14:39:00**—Sally Yang cuts the confidential stamp off the Patent Application.

- **Ex. 73: 14:53:02—14:53:53**—P.Y. Yang again directs Lee not to leave the clippings in the hotel room.

- **Ex. 73: 15:19:32—15:21:46**—In this section P.Y. Yang confirms that Lee had given the defendants information about rubber used in medical tape.

- **Ex. 73: 17:09:46—17:17:42**—In this section the defendants discuss Kai–Lo Hsu who had been arrested for attempting to steal trade secrets from Bristol Meyers, and P.Y. Yang talks about how careful he has been and tells Lee "You can collect or get some new samples, or the new research trends. whatever's tomorrow's products we have to develop earlier. As a research institute we do not need to copy the thing, we can modify it."

- **Ex. 74A**—Patent Application as modified by defendants

- **Ex. 79A**—Confidential stamp removed from patent Application.

(*See* Trial Tr. 1194–1222; *see also* Government's Statement of Facts at 3–7.)

The documentary and videotape evidence presented by the Government at trial conclusively established the Defendants' guilt. The Defendants, even without the benefit of using Dr. Lee's false testimony against him, exhaustively cross-examined Dr. Lee and consistently discredited his testimony. Dr. Lee's cross-examination began Monday afternoon, April 12, 1999, and ended Thursday morning, April 15, 1999, when Defense Counsel finished its re-cross-examination. After reviewing the trial transcript thoroughly, it is the Court's opinion that Dr. Lee's credibility was nearly, if not absolutely, destroyed at the close of his testimony. Heaping on more impeachment evidence would have done little, if anything, to further discredit Dr. Lee.[5] The Court, there-

---

5. Furthermore, the Court instructed the Jury as follows:

Another part of your job as jurors is to decide how credible or believable each witness was.... It is up to you to determine if a witness's testimony was believable and how much weight you think it deserves. You are free to believe everything that a witness said or only part of it or none of it at all. (Trial Tr. 2667: 11–16.)

Ask yourself how good the witness's memory seemed to be. Did the witness seem able to accurately remember what happened? (Trial Tr. 2667: 25, 2668: 1–2.)

Ask yourself how the witness acted while testifying from the witness's demeanor, did he or she appear to be testifying truthfully or untruthfully. (Trial Tr. 2668: 6–8.)

Also ask yourself if the witness had any relationship to the government or the defendants or anything to gain or lose from the case that might influence the witness's testimony. (Trial Tr. 2668: 9–12.)

Also ask yourself if the witness had any bias or prejudice or any reasons for testifying that might cause a witness to lie or slant the testimony in favor of one side or the other. (Trial Tr. 2668: 13–16.)

Also consider if the witness testified inconsistently while on the witness stand or if the witness said or did something or failed to say or do something at any other time that is inconsistent with what the witness said while testifying. (Trial Tr. 2668: 17–21.)

Was the witness's testimony supported or contradicted by other evidence that you found believable. (Trial Tr. 2668: 22–23.)

You've heard testimony of Victor Lee. You have also heard that before this trial under oath Dr. Lee made a statement that may be different from his testimony here in Court. (Trial Tr. 2669: 3–6.) This earlier statement was brought to your attention to help you decide how believable his testimony was. You can use it as one way of evaluating his testimony in Court. (Trial Tr. 2669: 7–9.)

fore, cannot conclude that there is a reasonable probability that the result of the trial would have been different had the Defendants' been able to impeach Dr. Lee using his false testimony.[6] Accordingly, the Defendants have not established the third and fourth prongs of *O'Dell* and are not entitled to a new trial.

## BRADY VIOLATION: NON-DISCLOSURE OF MENTAL HEALTH RECORDS

The Defendants argue that Dr. Lee's mental health records are material evidence because they would have enhanced their ability to impeach Dr. Lee.[7] (*See* Defts.' Post–Hrg. Brief at 24–26.) The Defendants' argument is without merit.

■ The Supreme Court in *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), held that impeachment evidence must also be disclosed under *Brady. See id.* 527 U.S. 263, 119 S.Ct. at 1948 (*citing Bagley*, 473 U.S. at 676, 105 S.Ct. 3375). The Court further held that undis-

closed evidence is material "if there is a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." 527 U.S. at ——, 119 S.Ct. at 1948 (*citing Kyles*, 514 U.S. at 437, 115 S.Ct. 1555). Additionally, the Sixth Circuit has held that "whether evidence is 'material' does not depend upon 'whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of' confidence.'" *United States v. Frost*, 125 F.3d 346, 382–383 (6th Cir.) *cert. denied*, —— U.S. ——, 119 S.Ct. 40, 142 L.Ed.2d 32 (1998) (*citing Kyles*, 514 U.S. at 434, 115 S.Ct. 1555).

■ The evidence withheld from the Defendants prior to trial was not material to the outcome of the case. Dr. Lee's credibility was devastated at the end of cross-examination and the Defendants would have gained nothing from introducing Dr. Lee's mental health records.[8] The

One more thing about Dr. Lee. He has plead guilty to one count of wire fraud....You also heard that Dr. Lee entered into a plea agreement in which he has received promises from the government that he will not be prosecuted for any other charges.... [Y]ou should consider Dr. Lee's testimony with more caution than the testimony of other witnesses. Consider whether his testimony may have been influenced by the government. (Trial Tr. 2669: 10–19.)
You also heard evidence that Dr. Lee entered into a settlement agreement with Avery Dennison in a civil case in which he was a party. (Trial Tr. 2669: 20–22.)
You may consider these things for the purpose of testing the credibility of Dr. Lee. Do not convict the defendants based on the unsupported testimony of such a witness standing alone, unless you believe his testimony beyond a reasonable doubt. (Trial Tr. 2669: 23–25, 2670: 1–2.)

6. Impeaching Dr. Lee with his false testimony would not have affected the Government's ability to prove any of the essential elements of the EEA counts. Accordingly, the case sub judice is unlike *Schledwitz*, where the court vacated a conviction because witness statements withheld by the Government "would

have directly undercut the intent requirement for [the crime committed]." 169 F.3d at 1014.

7. Contrary to the Defendants contentions, there is no evidence contained in Dr. Lee's mental health records that is directly exculpatory and thus "material either to guilt or punishment" as originally contemplated in *Brady. See Strickler*, 527 U.S. at ——, 119 S.Ct. at 1948 (*citing Brady*, 373 U.S. at 87, 83 S.Ct. 1194).

8. The Defendants do not directly assert that Dr. Lee would have been incompetent to testify, but such an argument would likely have been made at trial. There is no question that Dr. Lee was competent under FED. R. OF EVID. 601 to testify and the Court would have made such a ruling had the argument been raised. Rule 601 states that, "[e]very person is competent to be a witness except as otherwise provided in these rules." The Advisory Committee Notes further state that the rule "eliminates all grounds of incompetency not specifically recognized in the rules of this Article." As such, there are no specific "mental or moral qualifications for testifying as a witness" *Id.* Moreover, the Sixth Circuit has held, "the Federal Rules of Evidence strongly

information contained in the records merely would have been cumulative impeachment evidence. As such, there is no reasonable probability that had the records been introduced, the outcome of the trial would have been different. Additionally, the non-disclosure of Dr. Lee's mental health records did not affect the fairness of the trial nor undermine confidence in the verdict. The Defendants convictions were supported by the overwhelming weight of the evidence. Accordingly, where the evidence withheld from the defense is not material, there can be no *Brady* violation and no new trial.

## ENTRAPMENT

■ The Defendants argue that Dr. Lee's false testimony and the non-disclosure of his mental health situation affected their ability to present an entrapment defense to the jury. (Defts.' Reply Memo. in Support of Supplemental Mot. for New Trial at 11; Defts.' Post–Hrg. Brief at 44.) The Supreme Court in *Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), set forth the basic framework for the entrapment defense. In *Jacobson*, the Court held that where the Government induces individuals to break the law and entrapment is an issue, "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson* 503 U.S. at 548–49, 112 S.Ct. 1535 (*citing United States v. Whoie*, 925 F.2d 1481, 1483–1484 (1991)). Thus, the Government was required to prove beyond a reasonable doubt that the Defendants were predisposed to commit the crimes for which they were charged.

■ In *Jacobson*, the Government undertook an elaborate sting operation to apprehend a man in Nebraska who was interested in pornography, expressed his interest in materials that were lawful, and who attempted to further his First Amendment right to view materials that were unlawful by becoming involved in a Government-created civil liberties campaign. The Court held,

> In their zeal to enforce the law ... Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute.

*Jacobson*, 503 U.S. at 548, 112 S.Ct. 1535 (*citing Sorrells v. United States*, 287 U.S. 435 at 442, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)). In the present case, the Government did nothing more than present individuals who were already pre-disposed to commit economic espionage with the opportunity to do so.

The Defendants were offered an opportunity to steal an Avery patent application and immediately seized it. In this situation, "the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition." *Jacobson*, 503 U.S. at 550, 112 S.Ct. 1535 (*citing United States v. Sherman*, 200 F.2d 880, 882 (2d Cir.1952)). The Court in *Jacobson* reasoned that "Had the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner—who must be presumed to know the law—had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction." *Id.* (*citing Mathews v. United States*, 485 U.S. 58, 66, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)).

On the videotape, it is abundantly clear that P.Y. Yang conspired and attempted to steal Avery trade secrets. As the sting

---

disfavor barring witnesses on competency grounds due to mental incapacity." *United States v. Phibbs*, 999 F.2d 1053, 1068 (6th Cir.) *cert. denied Phibbs v. U.S.*, 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994).

videotape reveals, P.Y. and Sally Yang acknowledged receipt of the materials previously sent by Dr. Lee and described them as "useful." (Exhibit 73: 13:03:10–13:07:25.) P.Y. Yang stated that the materials sent may contain "unused hidden treasures" that would be advantageous to Four Pillars, and that what had previously been sent to them by Dr. Lee would be reexamined. (Exhibit 73: 13:22:15–13:23:22.) Most importantly, when Dr. Lee offered the Yangs the patent application for certain adhesive technology, Dr. Lee described the document to them as "confidential," and an "internal confidential document" that is "not open to the public." (Exhibit 73: 13:50:54–13:58:24.) P.Y. Yang, referring to the confidential markings, then stated to Sally Yang, "You have to cut it." (Exhibit 73: 14:14:00–14:18:00.) The videotape then shows P.Y. and Sally Yang cutting the confidential markings from the pages which contained the mock patent application. After cutting the confidential markings from the pages, P.Y. Yang directed Dr. Lee to dispose of them at home. (Exhibit 73: 14:26:36; 14:53:02–14:53:53.)

Any reasonable person viewing the videotape evidence would conclude that the Defendants were in Ohio to obtain confidential and proprietary information from Dr. Lee. When Dr. Lee presented the Defendants with the mock patent application from Avery, the Yangs, without any hesitation, cut the confidential markings out and retained the substantive portions of the documents. The Government merely offered the Defendants the opportunity to commit economic espionage in a controlled setting, and the Defendants took advantage of it. As such, the Court concludes that the Government offered more than enough evidence to establish that the Defendants were predisposed to steal Avery's confidential and proprietary information.

Despite the overwhelming evidence of predisposition captured on the videotape and contained in the documentary evidence described above, the Defendants argue that the Government sting operation induced them to commit a crime they were not already predisposed to commit. The Court in *Jacobson* expressed serious concern about the nature of the sting operation used to snare the petitioner in that case. The Court reasoned that,

> By the time petitioner finally placed his order [for child pornography], he had already been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations. Therefore, although he had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985.

*Jacobson,* 503 U.S. at 550, 112 S.Ct. 1535 (*citing Sorrells,* 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *Sherman,* 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)). Predisposition has been defined by the Sixth Circuit as " 'the defendant's state of mind before his initial exposure to government agents.' " *United States v. Harris,* 9 F.3d 493, 498 (6th Cir.1993) (*citing United States v. McLernon,* 746 F.2d 1098, 1112 (6th Cir.1984)) (citation omitted). Additionally, the court explained that

> Predisposition "focuses upon whether the defendant was an 'unwary innocent' or instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetuate the crime." The government certainly may use undercover agents as an aid to law enforcement. The defense of entrapment exists to thwart the government from "originat[ing] a criminal design, implant[ing] in an innocent person's mind the disposition to commit a criminal act, and then induc[ing] commission of the crime so that the Government may prosecute."

*Id.* at 497 (*citing United States v. Barger,* 931 F.2d 359, 366 (6th Cir.1991); *Jacobson,* 503 U.S. at 553, 112 S.Ct. 1535).

The Defendants have not produced any evidence to refute the Government's proof of predisposition. Moreover, the Defendants have not proven that the Government's sting operation induced the Defendants to commit economic espionage. Defendants actions in this case, prior to the commencement of the Government's sting operation, were "independent" and were "not the product of the attention the Government" directed at the Defendants. The Defendants had a long relationship with Dr. Lee prior to any Government investigation of their criminal activity. It has been established that the Defendants' relationship with Dr. Lee, beginning in 1989, was inappropriately focused on obtaining Avery confidential and proprietary information. Although the Defendants were not actually apprehended by the Government until September 1997, their activities leading up to the sting operation establish that they were predisposed to commit the crimes for which they were convicted.[9] The Government only became involved in the Lee–Yang/Four Pillars relationship seven months prior to the actual sting of the Defendants. In those seven months, the Government did not induce unwary Taiwanese business persons to violate American laws by dangling in front of them trade secrets from a close competitor. Rather, the Government was responding to the Defendants prior activity. As such, the Government did not induce the Defendants to do anything they would not already have been predisposed to do. Accordingly, neither Dr. Lee's false testimony, nor his mental health, undermined the Government's proof of predisposition.

At trial, the question of predisposition ultimately rested with the Jury. The Jury was charged, according to the standard set forth in *Harris,* to apply the following factors to determine whether the Defendants were predisposed to commit the crimes:

(1) the character or reputation of the defendant, including any prior criminal record;

(2) whether the suggestion of the criminal activity was initially made by the Government;

(3) whether the defendant was engaged in the criminal activity for profit;

(4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and

(5) the nature of the inducement or persuasion supplied by the Government.

*Harris,* 9 F.3d at 498; *see* Trial Tr. at 2688: 5–25, 2689: 1–25.

In order to convict the Defendants, the Jury had to find, beyond a reasonable doubt, that the Government (1) proved the Defendants' predisposition to violate the EEA; and (2) that the Government had not impermissibly induced them to do so.[10] The Defendants have not produced sufficient evidence for this Court to conclude that there was a probability, or even a likelihood, that the Jury's decision on the entrapment issue would have been different had the evidence of Dr. Lee's false testimony been presented at trial.

Rather, the evidence supports the Jury's finding that the Defendants were predisposed to commit economic espionage and that the Government did not impermissibly induce them to do so. Four of the five factors set forth above cut in favor of such a finding. First, there can be no dispute

**9.** The Defendants' predisposition to steal Avery's trade secrets was convincingly established by the Government vis-à-vis documentary and videotape evidence notwithstanding the false testimony about Government Exhibits 17 and 19.

**10.** The Government, of course, also had to prove each element of the underlying offenses beyond a reasonable doubt.

that the Defendants were engaged in economic espionage well before the Government was ever alerted to their activity. Second, the Government presented evidence at trial that the Defendants were attempting to enhance their competitive position in the Asian market by obtaining technology from an industry-leading company. Next, the videotape evidence conclusively established that the Defendants acted without any reluctance when presented with the opportunity to obtain confidential and proprietary information from an industry-leading competitor. Finally, the Government merely presented the Defendants with the opportunity to commit economic espionage; it did not induce them in any way to violate the law.

The Defendants additionally have argued that evidence of Dr. Lee's mental health situation is material to their entrapment defense. The Court has reviewed Dr. Lee's mental health records in the context of the entrapment defense and concludes that the Defendants' argument is without merit.

Accordingly, the Jury's finding that the Defendants were predisposed to commit economic espionage will not be disturbed and the Defendants are not entitled to a new trial.

### DR. LEE'S SENTENCING HEARING

The Court has read and considered the sentencing transcript in the criminal case against Dr. Lee. (Lee Sentencing Hearing Transcript, November 8, 1999, 1:97CR271.) In light of the extensive discussion of the law and facts of this case, the Court concludes that Dr. Lee's statements at his sentencing hearing have no material impact on the case currently before this Court and would not have had an impact on the outcome of the trial. Dr. Lee was exhaustively cross-examined and impeached by the Defendants at trial. The Counts on which the Defendants were convicted were those which were corroborated by independent evidence of their guilt. Any further evidence of Dr. Lee's mental state or his relationship with the Government would merely have been cumulative impeachment evidence. Furthermore, Dr. Lee's statements at the sentencing hearing have no bearing on the Defendants' entrapment defense. As such, the statements made by Dr. Lee at his sentencing hearing did not affect the outcome of this case at trial; nor did his statements have any impact on the Defendants joint motions for a new trial.

### CONCLUSION

The Defendants have not established that Dr. Lee's false testimony concerned material exculpatory evidence or affected their ability to impeach him at trial. Additionally, the Defendants have not shown that the Government's failure to disclose Dr. Lee's mental health situation and records was material to the outcome of the case and thus a violation of *Brady*. Finally, the Defendants have not shown that Dr. Lee's false testimony or his mental health situation would have had any bearing on the Defendants' predisposition to commit the crimes for which they were convicted.

Accordingly, the Defendants' Joint Motion and Supplemental Joint Motion for a New Trial (Dkt.# 347 & # 351) are hereby **DENIED**.

**IT IS SO ORDERED.**